**Electronically Filed
Supreme Court
28583
09-AUG-2011
01:37 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent and Petitioner/Plaintiff-Appellee,

vs.

JENARO TORRES,
Petitioner and Respondent/Defendant-Appellant.

NO. 28583

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CR. NO. 05-1-2556)

AUGUST 9, 2011

ACOBA, AND DUFFY, JJ., CIRCUIT JUDGE POLLACK IN
PLACE OF RECKTENWALD, C.J., RECUSED, AND CIRCUIT
JUDGE BORDER ASSIGNED DUE TO A VACANCY;
WITH NAKAYAMA, ACTING C.J., CONCURRING SEPARATELY AND DISSENTING

AMENDED OPINION OF THE COURT BY ACOBA, J.[1]

We hold that where the State seeks to prosecute a

---

[1] On May 2, 2011, Respondent and Petitioner/Plaintiff-Appellee State of Hawaiʻi (Respondent) filed a Motion for Reconsideration in response to this court's April 15, 2011 published opinion, State v. Torres, No. SCWC-28583, slip op. (Apr. 15, 2011). On June 30, 2011, this court granted Respondent's Motion, in part, to modify the April 15, 2011 opinion, as set forth herein.

defendant in a Hawaiʻi state court, and seeks to admit evidence obtained in another jurisdiction, the court must give due consideration to the Hawaiʻi Constitution and applicable case law, as indicated herein, when assessing whether such evidence is admissible against the defendant.  Both Respondent and Petitioner and Respondent/Defendant-Appellant Jenaro Torres (Petitioner) applied for writs of certiorari to review the January 7, 2010 judgment of the Intermediate Court of Appeals (ICA)[2] filed pursuant to its December 15, 2009 published opinion vacating the May 29, 2007 judgment of conviction filed by the circuit court of the first circuit (the court).[3]  We accepted Petitioner's Application for writ of certiorari (Petitioner's Application or Application) to correct the ICA's analysis with regard to the admissibility of evidence obtained by federal officers in a state court prosecution.

In accordance with the opinion set forth herein, we uphold that portion of the ICA's opinion affirming the legality of the searches of Petitioner's vehicle under federal law. However, we correct the opinion of the ICA insofar as it failed to additionally consider whether the searches of Petitioner's vehicle also comported with the Hawaiʻi Constitution and applicable case law.  We affirm the opinion of the ICA in all

---

[2]     The opinion was authored by Chief Judge Craig H. Nakamura and joined by Associate Judges Alexa D.M. Fujise and Katherine G. Leonard.

[3]     The Honorable Michael A. Town (now retired) presided over the relevant proceedings.

other respects and we affirm the court's December 5, 2006 order denying Petitioner's motion to suppress under the Hawai'i Constitution.

I.

The following relevant facts, some verbatim, are from the ICA opinion and the record.

A.

Ruben Gallegos (Gallegos) worked as a cashier at the Pearl Harbor Naval Base (PHNB) Navy Exchange. State v. Torres, 122 Hawai'i 2, 6, 222 P.3d 409, 413 (App. 2009). On May 1, 1992, Gallegos was assigned to cash paychecks at a satellite cashier's cage (cashier cage). Id. at 7, 222 P.3d at 414. Prior to reporting to the cashier cage, Gallegos received $80,000 in cash. Id. Shortly after Gallegos had been escorted to the cashier cage, Petitioner, who was a police officer at PHNB, arrived at the cashier cage in his police uniform, although Petitioner was not scheduled to work on that day. A witness saw Gallegos exit the cashier cage carrying the canvas cash bag and saw the two men walk toward the parking area. Id. Military authorities were subsequently notified that Gallegos was not at his post and "an all points bulletin was issued to detain and arrest [Petitioner] and Gallegos[.]" Id. at 8, 222 P.3d at 415.

Later that day, PHNB police officer Napoleon Aguilar (Officer Aguilar) saw Petitioner in a line of cars waiting to enter PHNB. Id. Officer Aguilar waived Petitioner through, but,

3

once through, motioned for him to stop. Id. When Petitioner rolled down his window to shake Officer Aguilar's hand, Officer Aguilar reached into Petitioner's vehicle and turned off the ignition. Id. A struggle ensued but Petitioner eventually complied with Officer Aguilar's orders, exited the vehicle, and was arrested. Id. Because Petitioner's vehicle was blocking traffic, PHNB Police Sergeant James Rozkiewicz (Sergeant Rozkiewicz) moved it to a nearby parking lot. Id. Pursuant to base procedures for securing an unattended vehicle, Sergeant Rozkiewicz checked the vehicle and the trunk for hazardous or flammable substances. Id. When Sergeant Rozkiewicz attempted to lock the glove compartment, the compartment door fell open, revealing a .38 caliber revolver and a scanner. Id.

Naval Criminal Investigative Service (NCIS) Special Agent Ty Torco (Agent Torco) prepared an affidavit in support of a Command Authorization for Search and Seizure (Command Authorization), seeking authorization to search Petitioner's vehicle. Id. at 16, 222 P.3d at 423. The affidavit detailed the information Agent Torco had learned regarding Petitioner's alleged involvement in the theft of $80,000 from the Navy Exchange and also included the observations made by Sergeant Rozkiewicz during his inspection and securing of Petitioner's vehicle. Id. The Command Authorization was signed by E.A. Warner, Commander of PHNB. Id.

A subsequent search of Petitioner's vehicle by NCIS and FBI agents revealed a brown bag in the trunk, which NCIS agents recognized as the type of bag used by the Navy Exchange to transport cash. Id. at 8, 222 P.3d at 415. The bag contained $77,971.82 in cash, along with other items, including a wallet in which Gallegos's driver's license, Navy Exchange identification card, bank card, temporary pass to Pearl Harbor, and other papers were found. Id. NCIS agents also recovered a .38 caliber revolver registered to Petitioner, a stun gun, and a scanner in the glove compartment. Id. NCIS agent Robert Robbins (Agent Robbins) testified at Petitioner's trial that upon examination of the revolver obtained from Petitioner's vehicle, he discovered that there were two intact bullets and three spent cartridge casings in the revolver. Id. Gallegos, who had been reported missing on May 1, 1992, was never seen again. Id.

Petitioner was subsequently charged by the federal government with theft and possession of a loaded firearm on a public highway without a license. Id. at 6, 222 P.3d at 413. Petitioner pled no contest to both charges in federal court and was sentenced to concurrent terms of two years of imprisonment. Id.

Thirteen years after the federal charges were filed, Respondent charged Petitioner with murder in the second degree of Gallegos, in violation of Hawaiʻi Revised Statutes (HRS)

§ 707-701.5 (Supp. 1992).[4]  The indictment further stated that Petitioner was subject to sentencing under HRS § 706-660.1 (Supp. 1992),[5] for having "a firearm in his possession or threatened the use or used the firearm while engaged in the commission of [a] felony, whether the firearm was loaded or not, and whether operable or not."

                              B.

     On July 24, 2006, Petitioner filed a Motion to Suppress Evidence No. 2 with the court, seeking to preclude all evidence obtained from the search of his automobile, including the handgun, stun gun, scanner, victim's wallet, identification, and other papers, nearly seventy-eight thousand dollars, and all testimony derived therefrom.  Petitioner claimed that the

---

[4]     HRS § 707-701.5, in effect at the time, stated:

>      **Murder in the second degree**. (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>      (2)  Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[5]     HRS § 706-660.1 provided in pertinent part:

>      **Sentence of imprisonment for use of a firearm, semiautomatic firearm, or automatic firearm in a felony**. (1) A person convicted of a felony, where the person had a firearm in the person's possession or threatened its use or used the firearm while engaged in the commission of the felony, whether the firearm was loaded or not, and whether operable or not, may in addition to the indeterminate term of imprisonment provided for the grade of offense be sentenced to a mandatory minimum term of imprisonment without possibility of parole or probation the length of which shall be as follows:
>      (a)   For murder in the second degree and attempted murder in the second degree--up to fifteen years[.]

6

searches of his vehicle violated article I, section 7 of the Hawaiʻi Constitution[6] and the Fourth[7] and Fourteenth[8] Amendments to the United States Constitution.

On January 10, 2007, the court issued its Order Denying Petitioner's Motion to Suppress No. 2 (order). In its order, the court made the following findings of fact (findings).

> 1. On May 1, 1992, [Sergeant Rozkiewicz was] on duty as a base police officer for the [PHNB] and was the acting desk lieutenant. At the time, he had been employed as a base police officer for 6 years.
> 2. On May 1, 1992, [Officer Aguilar] was also working as a [PHNB] police officer and assigned to guard duty at the Makalapa Gate of the [PHNB].
> 3. The [PHNB] is a place where nuclear submarines, ships and other military transport vehicles are housed.
> 4. The [PHNB] also has various officers in high command positions stationed on the base.
> 5. The [PHNB] had specific regulations for entrance onto the base as provided for in the Internal Security Act of 1950.
> 6. Pursuant to the Internal Security Act of 1950, the [PHNB] posted a clear and visible sign at the entrance gate which stated: "Authorized Entry Onto This Installation Constitutes Consent To Search Of Personnel And The Property Under Their Control. Internal Security Act of 1950 Section 21; 50 U.S.C. 7979."

---

[6] Article I, section 7 of the Hawaiʻi Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches, seizures and invasions of privacy shall not be violated[.]"

[7] The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[8] The Fourteenth Amendment to the United States Constitution states in pertinent part that

[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

7.  The aforementioned sign was posted at the Makalapa Gate prior to and on May 1, 1992.

8.  Any person who, after reading the sign, decides not to consent to a search of their [sic] person or property can turn around and leave without having their [sic] person or property searched.

9.  Additionally, the guard shack where a person would have to report in order to gain entrance onto the base was located approximately 50 feet past the sign, thus giving a person ample opportunity to turn around if the person did not want to be subjected to a search of their [sic] person or property.

10.  The duties of a base police officer included enforcement of rules and regulations regarding entry onto the base as well as enforcement of the laws on the base.

11.  [Sergeant] Rozkiewicz had receiving [sic] recruit training and other ongoing or recall training regarding the rules and regulations on base.

12.  Prior to May 1, 1992, [Sergeant] Rozkiewicz was [Petitioner's] supervisor.  [Petitioner] was also employed as a [PHNB] police officer.  [Petitioner] had knowledge of the rules and regulations concerning entry onto the base because he had received training regarding the Internal Security Act of 1950 and the regulations concerning procedures to search persons and property.

13.  [Officer] Aguilar and [Petitioner] went to training together in June 1990 at the Pearl Harbor police academy and they received training on the Internal Security Act of 1950.

14.  On May 1, 1992, prior to 2:30 p.m., [Sergeant] Rozkiewicz was aware of the theft of $80,000.00 from the Navy Exchange and that the persons involved was [sic] the courier [] [Gallegos] and [Petitioner].

15.  Sometime after 11:00 a.m., [Officer] Aguilar received information from [Sergeant] Rozkiewicz and Major Cruciano that both Gallegos and [Petitioner] were suspects in the theft of $80,000.00 from the Navy Exchange.

16.  Around 2:10 p.m., [Officer] Aguilar saw [Petitioner]'s vehicle, a silver-gray Chevrolet Celebrity with the license place "KUNSIL" approach the Makalapa Gate.

17.  [Petitioner] entered the Makalapa Gate, at which time [Officer] Aguilar motioned for him to stop the vehicle. Upon stopping the vehicle, [Officer] Aguilar reached into the vehicle to turn it off and grabbed the shifting level which was already in park.

18.  [Officer] Aguilar informed [Petitioner] that [] [NCIS] wanted to talk to him about the incident, [Petitioner] began to struggle to restart the vehicle.

19.  [Officer] Aguilar then ordered [Petitioner] out of the vehicle and issued a felony stop.

20.  [Petitioner] complied with [Officer] Aguilar's order and stepped out of his vehicle.

21.  [Petitioner] was ordered to lie face-down in the grassy median strip and subsequently handcuffed.

22.  When [Sergeant] Rozkiewicz arrived on the scene around 2:30 p.m., he observed traffic backing up from the inbound lanes of the Makalapa Gate to Kam Highway. [Sergeant] Rozkiewicz then made a decision to get traffic going and moved the vehicle into the base chapel parking lot that was approximately 31 feet away.

8

23. _After moving the vehicle, [Sergeant] Rozkiewicz followed base police procedures in securing the vehicle, which required police to check a vehicle that was going to be left unattended on base_, for flammable or volatile substances such as gasoline, kerosene and explosives.

24. [Sergeant] Rozkiewicz attempted to secure and lock the glove compartment within [Petitioner's] vehicle by using what he thought was the key for the glove compartment. In doing so, _the glove compartment lid fell down, at which time, [Sergeant] Rozkiewicz observed a scanner and a pistol in the glove compartment_.

25. _The viewing of the contents in the glove compartment by [Sergeant] Rozkiewicz was inadvertent and at the time, [Sergeant] Rozkiewicz was not searching for evidence_ pertaining to the theft of $80,000.00 from the Navy Exchange or the murder of [] Gallegos. Further, [Sergeant] Rozkiewicz did not remove or search the glove compartment after the initial inadvertent viewing of the glove compartment contents.

26. _[Sergeant] Rozkiewicz opened the trunk of [the] vehicle to make a visual check and ensure there were no items within the truck [sic] that would "catch fire" or explosives_, and during this check, [Sergeant] Rozkiewicz observed a base police uniform shirt, a pair of dark trousers, a Sam Browne leather gear and a black plastic bag that was partially open, exposing a section of brown leather.

27. The visual check of the truck [sic] comported with the [PHNB] police routine to secure vehicles on base [] to ensure the safety of the personnel and the military transport vehicles on base, and that the routine check was not for the purpose of searching for evidence pertaining to the theft of the $80,000.00 or the murder of [] Gallegos.

28. When [Petitioner] approached the [PHNB] Makalapa Gate, he intended to gain entry onto the base.

29. Searches conducted pursuant to the Internal Security Act of 1950 is [sic] necessary for the protection of military transport vehicles and base personnel.

30. _[Petitioner] did not indicate to anyone that he was revoking his consent to enter onto the base or that he intended to leave the base_. As such, because of [Petitioner's] training and knowledge of base procedures, he consented to a search of his person and vehicle when he entered the Makalapa Gate.

31. Notwithstanding [Sergeant] Rozkiewicz' observations, the Naval Criminal Investigators and base police had sufficient information to obtain a [Command Authorization] pursuant to Rule 315, _Military Rules of Evidence_ and therefore, would have inevitably discovered the evidence in [Petitioner's] vehicle after obtaining a [Command Authorization].

32. The [Command Authorization] was properly applied for and signed by [E].A. [W]arner, Commander of the [PHNB] pursuant to Rule 315, _Military Rules of Evidence_.

33. A commander qualifies as a neutral and detached magistrate for the purpose of determining probable cause.

34. There was sufficient probable cause for the issuance of the [Command Authorization].

35. [Respondent's] witnesses are credible.

(Emphases added.)

The court made the following conclusions of law (conclusions).

1. The Internal Security Act of 1950 (50 U.S.C. 797) authorized the search of a [d]efendant's person and property under his control.

2. There was a government interest in protecting the [PHNB] and a person with notice of such impending search into a restricted area with heightened security relinquishes any reasonable expectation of privacy. United States v. Jenkins, 986 F.2d 76, 79 ([4th Cir.] 1993).

3. Great deference must be shown to the special needs of the Armed [F]orces at military and naval installations. United States v. Ellis, 15 F. Supp. 2d 1025 (1998).

4. Searches on closed military bases are exempt from the usual Fourth Amendment requirements of "probable cause." [Jenkins], 986 F.2d 76 [].

5. [Petitioner] having knowledge of the Internal Security Act of 1950, his conduct of driving onto the [PHNB] and the absence of any evidence to indicate that [Petitioner] revoked his consent demonstrate[] that [Petitioner] consented to a search of his person and property under his control when he entered the Makalapa Gate. See State v. Hanson, 97 Haw[aiʻi] 71, 34 P.3d 1 (2001) [(hereinafter, "Hanson II"), affirming State v. Hanson, 97 Hawaiʻi 77, 34 P.3d 7 (App.) (hereinafter, "Hanson I")].

6. There was no search within the meaning of [a]rticle 1, [s]ection 7 of the Hawaiʻi State Constitution, the Fourth and Fourteenth Amendments of the United States Constitution where [Sergeant] Rozkiewicz was following base procedures to secure the vehicle, at which time, the glove compartment door fell open and thereby exposing the pistol and scanner inside the glove compartment.

7. Because the investigating officers had sufficient probable cause to obtain a search warrant at the time [Petitioner] entered the Makalapa Gate of the [PHNB], the investigating officers would have inevitably obtained a [Command Authorization] pursuant to Rule 315, Military Rules of Evidence. State v. Lopez, 78 Haw[aiʻi] 433, 896 P.2d 889 (1995).

8. A [Command Authorization] pursuant to Rule 315, Military Rules of Evidence complies with the requirements of Chapter 803, [HRS].

9. The [Command Authorization] was signed by E. A. Warner, a base commander, as authorized by Rule 315, Military Rules of Evidence, and the base commander qualifies as a neutral and detached magistrate as required in Chapter 803, [HRS]. United States v. Banks, 539 F.2d 14 (9th Cir. 1976).

10. There was sufficient probable cause for issuance of a [Command Authorization] even if the affidavit was based in part on illegal [sic] seized evidence, where sufficient probable cause existed to issue the authorization for search and seizure without reliance on the suppressed evidence. State v. Brighter, 63 Haw. 95, 621 P.2d 374 (1980).

(Emphases added.) Respondent did not challenge the findings and conclusions of the court. Therefore, the court's findings are binding in the instant appeal and furthermore, any objections to the court's findings and conclusions are deemed waived. "[P]oints not argued may be deemed waived." Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7) (2010).

C.

Trial commenced on March 6, 2007. At trial, Susan Davis (Davis) testified that she became acquainted with Petitioner while Davis and Petitioner were working for a pharmaceutical company. Torres, 122 Hawaiʻi at 9, 222 P.3d at 416. According to Davis, Petitioner confided to her that he had been involved in a robbery and insinuated that he had killed one of the individuals involved. Id. Davis testified that she had not told anyone because Petitioner had threatened to harm her and her family if she did. Id.

On March 21, 2007, a jury convicted Petitioner of murder in the second degree and found that Petitioner possessed, used, or threatened the use of a revolver during the commission of a murder, and on May 29, 2007, Petitioner was sentenced by the court. On June 8, 2007, Petitioner filed a notice of appeal.

D.

On December 15, 2009, the ICA vacated the court's judgment and remanded the case for a new trial based on its conclusion that the court erred in admitting the testimony of

11

NCIS Agent Robbins regarding the time-frame during which the revolver purportedly used in the murder was fired.[9] Torres, 122 Hawaiʻi at 34, 222 P.3d at 441. The ICA also concluded that (1) there was substantial independent evidence to corroborate Petitioner's incriminating statements, and, therefore, the admission of such statements was correct, id. at 12, 222 P.3d at 419; (2) federal law, as opposed to Hawaiʻi law, applied to Petitioner's motion to suppress, id. at 17, 222 P.3d at 424; and (3) under federal law, the search of Petitioner's vehicle was lawful inasmuch as the search met federal exceptions to the search warrant requirement, id. at 20-26, 222 P.3d at 427-33.

On April 7, 2010, Petitioner and Respondent each applied for review of the ICA's opinion. We rejected Respondent's Application for Writ of Certiorari. As indicated, we accepted Petitioner's Application to correct the ICA's opinion with respect to the admissibility of evidence obtained by federal officers in a state court prosecution.

---

[9] In its Application, Respondent presented the question of whether the ICA "gravely erred when it found that the [] court had abused its discretion in admitting Agent Robbins's lay opinion testimony regarding the revolver found in [Petitioner's] car[.]" The ICA concluded that the court "abused its discretion in admitting Agent Robbins's time-frame testimony" that the revolver recovered from Petitioner was fired "within the same day, probably about eight hours or so[,]" because (1) Respondent "did not set forth a sufficient foundation" for the admission of the testimony as a lay opinion, (2) Agent Robbins's opinion "required expert testimony[,]" and (3) Respondent "did not satisfy the foundational requirements for [the] admission of . . . [Agent Robbin's] testimony as expert testimony." Torres, 122 Hawaiʻi at 28, 222 P.3d at 435. The ICA thus concluded that Respondent "did not satisfy the foundational requirements for [the] admission" of Agent Robbin's "time-frame testimony as expert testimony." Id.

II.

Petitioner presents the following questions in his

Application:

> I. Whether the ICA gravely erred by holding that
> [Respondent] presented substantial independent evidence
> which corroborated Davis'[s] hearsay testimony regarding
> [Petitioner's] inculpatory statements[.[10]]
> II. Whether the ICA gravely erred by determining that
> federal law rather than Hawaiʻi law should apply to
> [Petitioner's] suppression motion and also whether its
> decision is inconsistent with *State v. Bridges*, 83 Haw[aiʻi]
> 187, 925 P.2d [357] (1996)[.[11]]
> III. Whether the ICA's decision regarding exceptions to the
> search warrant requirement is inconsistent with Arizona v.
> Gant, [-- U.S. --,] 129 S. Ct. 1710 (2009)[,] and whether
> the ICA gravely erred by determining that other exceptions
> to the warrant requirement applied[.[12]]

(Emphasis added.)

III.

This court has not yet squarely addressed the

circumstances under which evidence obtained by federal law

enforcement officers must be evaluated in a state prosecution.

In Bridges, this court considered the circumstances under which

"evidence obtained in one state [must] be suppressed in a

criminal prosecution in another state[.]"  83 Hawaiʻi at 194, 925

P.2d at 364.  Bridges noted that the issue "ha[d] been analyzed

---

[10]    Petitioner contends that his incriminating statements to Davis
were inadmissible because Respondent failed to introduce sufficient
independent evidence of the trustworthiness of the statements.  However, we
agree with the ICA that Respondent did introduce independent evidence
corroborating the essential facts set forth in Petitioner's statements to
Davis.  Torres, 122 Hawaiʻi at 12-13, 222 P.3d at 419-20.

[11]    As indicated infra, we review the ICA's analysis with regard to
the second question presented in his Application.

[12]    We conclude that Petitioner's third question must be answered in
the negative.  As indicated, we uphold that part of the ICA's opinion which
affirmed the legality of the searches of Petitioner's vehicle under federal
law.  Moreover, as discussed infra, Gant is not relevant to the instant case.

13

in two ways:  conflicts of law analysis and an exclusionary rule analysis." Id. at 195, 925 P.2d at 365 (internal quotation marks and citation omitted).  "Under a conflicts of law approach, courts analyze the issue as if it were a civil case and apply the choice of law method of the forum state to determine whether the law of the forum state or the situs state should be followed," and the "sanctions [] to be used if the appropriate law is violated." Id. (internal quotation marks and citation omitted).

Under the alternative exclusionary rule analysis, "the court first identifies the principles to be served by the exclusionary rule,[13] and then evaluates how the principles would be served by exclusion." Id. (internal quotation marks and citation omitted).  The Bridges court designated the exclusionary rule analysis, discussed infra, as the "better approach" to resolving issues regarding whether evidence obtained in another jurisdiction must be suppressed in a criminal prosecution in this state. Id.

In addition to the approaches set forth in Bridges, a third group of jurisdictions apply its exclusionary rules and constitutional standards to all evidence proffered in its courts,

---

[13]    "The freedom of individuals from unreasonable searches and seizures is a fundamental guarantee provided for by the Fourth Amendment to the United States Constitution and [a]rticle I, [s]ection 5 of the Constitution of the State of Hawaii." State v. Abordo, 61 Haw. 117, 120, 596 P.2d 773, 775 (1979).  The "exclusionary rule" effectuates the right protected by article I, section 5 of the Hawaiʻi Constitution, by "conferr[ing] upon defendants in . . . criminal prosecutions[,] the right to have excluded from trial evidence which has been obtained by means of an unlawful search and seizure." Id. (citations omitted).

14

without regard to where the evidence was obtained.  See State v.
Davis, 834 P.2d 1008, 1012 (Or. 1992) (explaining that because
Oregon's exclusionary rule protects individual rights, "[i]f the
government seeks to rely on evidence in an Oregon criminal
prosecution, that evidence must have been obtained in a manner
that comports with the protections given to the individual by
Article I, section 9, of the Oregon Constitution"); see also
State v. Cardenas-Alvarez, 25 P.3d 225, 232 (N.M. 2001) (noting
that, pursuant to the state constitution,[14] "when a federal agent
effectuates [] an intrusion and the State proffers the evidence
thereby seized in state court," such evidence is "subject[ed] []
to New Mexico's exclusionary rule").

Finally, some jurisdictions have held that evidence
obtained by officers acting lawfully under the law of their own
jurisdictions is admissible in state prosecutions.  See Pena v.
State, 61 S.W.3d 745, 754 (Tex. App. 2001) ("Evidence that is
obtained by federal agents acting lawfully and in conformity with
federal authority is admissible in state proceedings."  (Citing
Gutierrez v. State, 22 S.W.3d 75, 84 (Tex. App. 2000).)).  "This
has been referred to as the 'reverse silver-platter'

---

[14]     New Mexico Constitution, article II, section 10, provides as
follows:

> The people shall be secure in their persons, papers, homes
> and effects, from unreasonable searches and seizures, and no
> warrant to search any place, or seize any person or thing,
> shall issue without describing the place to be searched, or
> the persons or things to be seized, nor without a written
> showing of probable cause, supported by oath or affirmation.

15

doctrine.[15]  The underlying concept of the [] doctrine is that protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity." Id. (internal quotation marks and citation omitted).  Another rationale of courts adopting this approach has been that "a state's constitution that will not be invoked to control the conduct of its private citizens will not be applied to control the conduct of the officers of a foreign jurisdiction."  E.g., State v. Mollica, 554 A.2d 1315, 1325 (N.J. 1989).

IV.

Reviewing the aforementioned approaches, we agree with the ICA insofar as it determined that the exclusionary rule analysis applies to resolve the issue of whether evidence obtained by federal officers should be admitted in a state prosecution.  However, Bridges also noted that

> one could argue that evidence obtained in Hawaiʻi by federal officers in compliance with federal law (and therefore not illegally obtained) but in violation of some more restrictive aspect of Hawaiʻi law should be suppressed in criminal prosecutions in Hawaiʻi state courts.  See State v.

---

[15]  The Supreme Court had once held that evidence unlawfully obtained by state officers was admissible in federal court via a "silver platter." Lustig v. United States, 338 U.S. 74, 78-79 (1949).  The Court had reasoned that evidence obtained by state officers was outside the Fourth Amendment constitutional inquiry.  See Weeks v. United States, 232 U.S. 383, 398 (1914). This doctrine had been referred to as the "silver platter doctrine."  Notably, in Elkins v. United States, 364 U.S. 206, 223 (1960), the Supreme Court abolished this doctrine as unconstitutional.  The Court held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible . . . in a federal criminal trial."

The "reverse silver platter" doctrine refers to instances where state courts admit evidence obtained by federal officers in a manner that would not violate federal authority, but would violate their own state law or the state constitution.  See Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 1.5(c), 175 (4th ed. 2004).

16

> Rodriguez, . . . 823 P.2d 1026, 1029-30 ([Or. Ct. App.]
> 1992) [hereinafter, "Rodriguez I"], rev'd on other grounds
> [by State v. Rodriguez,] . . . 854 P.2d 399, 403-04 ([Or.]
> 1993) [hereinafter, "Rodriguez II"]; cf. [T. Quigley, "Do
> Silver Platters Have a Place in State-Federal Relations?
> Using Illegally Obtained Evidence in Criminal Prosecutions,"
> 20 Ariz. St. L.J. 285, 321-25 (1988)] ("In the case of
> evidence illegally seized by federal officers that is
> admissible in federal court because of an exception to the
> federal exclusionary rule, states should exclude the
> evidence consistent with their own exclusionary rule."). In
> the instant case, however, we need not, and do not, decide
> that issue.

80 Hawaiʻi at 199 n.15, 925 P.2d at 369 n.15. In this aspect,

Bridges recognized an approach akin to the third group of

decisions that held all evidence proffered in the state courts

were subject to the exclusionary rule standards under the State's

constitution.

In this connection, in support of footnote 15, Bridges

cited to Rodriguez I, 823 P.2d at 1029-30.[16] In addressing the

defendant's argument that his arrest by a federal agent was not

valid under the Oregon Constitution because the federal

administrative arrest warrant was not supported by oath and

affirmation, the Court of Appeals of Oregon noted that Oregon's

constitutional provision, requiring that all warrants be

supported by probable cause, oath, and affirmation, "does not

limit its application." Id. at 1029. That court declared that,

"[f]or the purpose of prosecuting state offenses in state courts,

the validity of an arrest is measured by state standards." Id.

According to Rodriguez I, as to "state prosecutions in state

_____

[16] The Oregon Supreme Court's decision, which overruled the decision
of the Court of Appeals of Oregon on other grounds, is discussed infra.

17

court[s], an arrest warrant is invalid if it is not supported by oath or affirmation." Id. Bridges thus acknowledged the persuasiveness of the third approach. Thus, for the reasons discussed infra, we must disagree with the ICA's holding that our exclusionary rule analysis "supports the application of federal law" alone in the instant case. Torres, 122 Hawaiʻi at 18, 222 P.3d at 425.

V.

Jurisdictions under this third approach have held that, where evidence obtained by federal agents is sought to be admitted in a state court prosecution, the admission of such evidence requires consideration of the state constitution. For example, in Rodriguez II, 854 P.2d at 400, the "[d]efendant [was] an alien who had been convicted of possession of a controlled substance" and, as a result, was facing deportation. An agent of the United States Immigration and Naturalization Service (INS) learned of the defendant's conviction and obtained an administrative arrest warrant for his arrest. Id. While attempting to execute the warrant, the INS agent obtained permission from the defendant to search the apartment. Id. at 400-01. The search revealed two guns, id. at 401, and when questioned, the defendant "stated that one of the guns was his" and that "the other . . . would have his fingerprints on it." Id.

The defendant was subsequently charged as a former convict in possession of a firearm under Oregon state law.  Id. Prior to trial, the defendant moved to suppress both the weapons and his statements, arguing that "the administrative arrest warrant was not supported by oath or affirmation, as required by the Oregon and United States Constitutions, that the arrest was therefore unlawful, and that the guns and statements should be suppressed as the 'fruit' of the unlawful arrest."  Id. (footnote omitted).  The trial court denied the defendant's motion.  Id.

On appeal in Rodriguez I, as noted supra, the Oregon Court of Appeals concluded that the defendant's arrest was unlawful because the arrest warrant was not valid under the Oregon Constitution, and the arrest was not a valid warrantless arrest.  Id.  The Oregon Supreme Court overturned the decision of the court of appeals on other grounds, but likewise held that evidence sought to be admitted in a state prosecution must comport with the Oregon Constitution.  Id. at 402.[17]  That court stated:

> "If the government seeks to rely on evidence in an Oregon
> criminal prosecution, that evidence must have been obtained
> in a manner that comports with the protections given to the
> individual by article I, section 9,[[18]] of the Oregon

---

[17]     The Oregon Supreme Court ultimately determined that the evidence was admissible under the Oregon Constitution because the defendant "consented to the search that uncovered the guns, and that consent was not obtained by exploitation of the unlawful conduct[.]"  854 P.2d at 405.

[18]     Article I, section 9 of the Oregon Constitution provides:

No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue
(continued...)

> Constitution. <u>It does not matter where that evidence was obtained (in-state or out-of-state), or what governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply</u>."

<u>Id.</u> at 403 (quoting <u>Davis</u>, 834 P.2d at 1012) (emphasis added).

Similarly, in <u>Cardenas-Alvarez</u>, 25 P.3d at 227, a federal agent seized eighty-five pounds of marijuana at a border patrol checkpoint north of the Mexican border. At trial before the New Mexico state court, the defendant moved to suppress the evidence arguing, <u>inter</u> <u>alia</u>, that the evidence was obtained in violation of the New Mexico Constitution. <u>Id.</u> The trial court denied the defendant's motion and that decision was reversed by the court of appeals. On certiorari, the Supreme Court of New Mexico held that although the federal agent did not violate the federal constitution, the seizure of the evidence violated the New Mexico Constitution and, therefore, the evidence should be excluded in state court. <u>Id.</u>

The Supreme Court of New Mexico stated that it found "no mandate in the text of [a]rticle II, [s]ection 10,[19] nor in [its] jurisprudence interpreting th[e] clause, to selectively protect New Mexico's inhabitants from intrusions committed by

---

[18](...continued)
   but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

<u>Id.</u> at 402.

[19]   <u>See</u> <u>supra</u> note 14 for the text of article II, section 10 of the New Mexico Constitution.

20

state but not federal governmental actors." Id. at 232. Cardenas-Alvarez explained that, "[u]nlike the private actors[,] . . . federal agents exercise jurisdiction over New Mexicans and possess the authority to systematically subject [New Mexico] inhabitants to searches, seizures and other interferences." Id. According to the Supreme Court of New Mexico, "[a] federal agent who wields these powers unreasonably commits precisely the sort of 'unwarranted governmental intrusion' against which the New Mexico Constitution ensures." Id. As said supra, it was held that New Mexico's exclusionary rule would be applied in the state court "when a federal agent effectuat[ed] such an intrusion[.]" Id.

In People v. Griminger, 524 N.E.2d 409, 410 (N.Y. 1988), federal agents obtained a search warrant from a federal magistrate to search the defendant's home for narcotics based on information provided by an undisclosed informant. The search was executed by federal agents and Nassau County (New York) police officers. Id. "The search produced 10 ounces of marijuana, over $6,000 in cash and drug-related paraphernalia[,]" and the defendant was subsequently charged with criminal possession of marijuana. Id. The issue before the Court of Appeals of New York was whether the two-prong test set forth in Aquilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969), which New York had "adopted . . . as a matter of State constitutional law," or the totality-of-the-circumstances

test adopted by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983), "should be employed in determining the sufficiency of an affidavit submitted in support of a search warrant application[,]" Griminger, 524 N.E. 2d at 409.

The New York Court of Appeals declined to adopt the Gates test, and reaffirmed the "Aguilar-Spinelli two-prong test[.]" Id. Additionally, the New York Court of Appeals rejected the prosecution's alternative argument that "[f]ederal law should apply . . . since the warrant was issued by a [f]ederal [m]agistrate and executed by [f]ederal agents." Id. at 412. The Griminger court explained that a defendant tried under the state's penal law should be afforded the benefit of the state's "search and seizure protections[.]" Id. (emphasis added).

VI.

The previous cases indicate that under the third approach, evidence obtained by federal officers must have been obtained lawfully under the constitutions of the respective states before being admitted in a state court prosecution. Similarly, some courts have held that where evidence obtained in one state (the situs state) is sought to be admitted in another state (the forum state), the forum state's constitution and laws must be followed.

People v. Taylor, 804 P.2d 196, 198 (Colo. App. 1990), concerned whether the phone records seized by North Dakota officials in North Dakota should be suppressed in a Colorado state court prosecution.  In that case, the defendant and her husband owned a bar in Durango, Colorado, and were suspected of arranging for others to cause an explosion in another bar located in Durango.  Id.  In the ensuing investigation, "a search warrant, based upon an affidavit drafted by a Colorado prosecutor, was issued by a North Dakota court to obtain the defendant's telephone records."  Id.  "Pursuant to the search warrant, North Dakota officials seized the defendant's phone records, . . . and the records were subsequently admitted into evidence" at the defendant's Colorado trial.  Id.

On appeal, the Colorado Court of Appeals distinguished precedent in which the Supreme Court of Colorado held that in a state court prosecution, the exclusionary rule did not require suppression of a defendant's confession that was obtained in violation of the Federal Rules of Criminal Procedure.  Id.  The Colorado Court of Appeals pointed out that, unlike that case, the defendant in the case before it, had "assert[ed] a constitutional violation and not simply the violation of a rule of criminal procedure."  Id.  That court concluded that "if there was a violation of the defendant's Colorado constitutional rights, then exclusion of the evidence would be mandated even though the

23

evidence may have been properly seized under the laws of the situs state."[20] Id.

In Stidham v. State, 608 N.E.2d 699, 700 (Ind. 1993), the defendant appealed his conviction for, inter alia, murder. The incident giving rise to the defendant's murder charge occurred in Indiana, but the defendant was arrested in Illinois after driving there following the incident. Id. The defendant made incriminating remarks during the course of his arrest. After contacting police officers in Indiana, the Illinois officers gave the defendant Miranda warnings and questioned the defendant, who was seventeen years old. Id.

On appeal, the Indiana Supreme Court noted that under Indiana law, a statement made by a person under the age of eighteen is not admissible unless counsel, the minor's custodial parent, guardian, or guardian ad litem is present, and both the minor and his representative waive the minor's right to remain silent. Id. That court rejected the prosecution's contention that because the statement of the defendant was lawfully obtained in Illinois, i.e., the situs state, it could be admitted in the Indiana court. Id. at 701.

The Stidham court explained that it was "fully aware of the cases . . . wherein other jurisdictions have held that in situations such as this, the statement would be admissible in the

_____

[20] That court ultimately concluded that the telephone records were obtained lawfully under the Colorado Constitution. See Taylor, 804 P.2d at 198-99.

prosecuting state." Id. (citations omitted). However, Stidham rejected the holdings in those cases, concluding that the proper inquiry was "the admissibility of [a] statement obtained in Illinois in a prosecution taking place in Indiana." Id. The Indiana Supreme Court ultimately held that the confession made by the defendant in Illinois after he was given his Miranda warnings was inadmissible under the Indiana statute. Id.; see also State v. Camargo, 498 A.2d 292, 296 (N.H. 1985) (holding that evidence obtained by a Massachusetts police officer was not admissible in New Hampshire because the "warrantless seizure and subsequent search of the defendant's vehicle were unreasonable under the State Constitution because no exigent circumstances existed to justify a warrantless search"); State v. Platt, 574 A.2d 789, 791-95 (Vt. 1990) (analyzing the legality of the seizure of the defendant's car by Massachusetts police officers under the Vermont Constitution).

## VII.

While we do not adopt the approach set forth in the foregoing cases in its entirety, those cases would appear to have merit. The ICA had concluded that under Bridges, federal law applied to the searches at issue in the instant case. Torres, 122 Hawaiʻi at 18, 222 P.3d at 425. The ICA explained that "PHNB is akin to a separate jurisdiction or a situs state for purposes of the Bridges analysis[.]" Id. at 18, 222 P.3d at 425. But, to reiterate, Bridges acknowledged that "one could argue that

evidence obtained in Hawaiʻi by federal officers in compliance with federal law . . . but in violation of . . . Hawaiʻi law should be suppressed in criminal prosecutions in Hawaiʻi state courts."  83 Hawaiʻi at 199 n.15, 925 P.2d at 369 n.15.

In the ICA's view, it was not clear that footnote 15 "contemplated the situation presented here, where the activities of the federal officers took place on a closed military base that was subject to the control of a military commander and was within the . . . jurisdiction of the United States."  Torres, 122 Hawaiʻi at 20, 222 P.3d at 427.  Thus, the ICA concluded that the "Bridges analysis, and the Bridges rationale for applying the law of the situs state support[ed] the application of federal law in this case."  Id.  However, Bridges' reliance on Rodriquez I reveals that Bridges did refer to circumstances presented in the instant case beyond simply the law of the situs state.  In that light due consideration must be given to the third approach.

## VIII.

An exclusionary rule analysis requires us to consider the principles served by that rule.  See supra.  Bridges identified three purposes underlying our exclusionary rule:  judicial integrity, protection of individual privacy, and deterrence of illegal police misconduct.  This court stated that

> [i]n Hawaiʻi, we have recognized a number of purposes underlying our exclusionary rule:  (1) judicial integrity, State v. Pattioay, 78 Hawaiʻi 455, 468, 896 P.2d 911, 924 (1995) ("to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts"); (2) individual privacy, [Lopez], 78 Hawaiʻi [at] 446, 896 P.2d [at] 902 [] ("to protect the privacy rights of our

26

> citizens" (emphasis omitted)); and, of course,
> (3) deterrence, Pattioay, 78 Hawaiʻi at 468, 896 P.2d at 924
> ("to deter illegal police conduct").

83 Hawaiʻi at 195, 925 P.2d at 365.

A.

"The 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution." Id. at 196, 925 P.2d at 366. According to Bridges, "[a]s a general rule, the question of whether given conduct is legal is answered by looking to the laws of the jurisdiction in which that conduct was performed, i.e., the situs state." Id. (citation omitted). Consequently, Bridges reasoned that because in that case, "[t]he evidence was apparently obtained in compliance with the laws of the state of California[,] . . . under the general rule," admission of the evidence "would not cause a loss of judicial integrity." Id.

Relying on Bridges, the ICA noted that (1) "[n]o Hawaiʻi law enforcement officer was involved in the searches of [Petitioner's] car"; and (2) "[t]he searches were conducted on a federal military base by federal officers whose activities were governed by federal law[.]" Torres, 122 Hawaiʻi at 19, 222 P.3d at 426. The ICA thus concluded that, "[a]s long as the evidence was obtained by the federal officers in compliance with federal law, Hawaiʻi courts would not be placing their imprimatur on

27

evidence that was illegally obtained by allowing the evidence to be admitted." Id.

Although Bridges stated that it was applying the exclusionary rule analysis, Bridges' consideration of only the jurisdiction in which the evidence was obtained seemingly reflected a conflicts of law approach. See Jennifer Friesen, State Constitutional Law § 11-3(d)(3) n.85.1 (2d ed. Supp. 1999) (citing Bridges as a conflicts of law case). Indeed, the cases Bridges cited to support its conclusion that "the question of whether given conduct is legal is answered by looking to the laws of the jurisdiction in which that conduct was performed, i.e., the situs state[,]" 83 Hawaiʻi at 196, 925 P.2d at 366, did not apply an exclusionary rule analysis. See United States v. Gerena, 667 F. Supp. 911, 919 (D. Conn. 1987) (noting that with respect to state conflicts, under a conflicts of law approach, "states generally determine the legality of alleged police conduct through application of the law of the place where the conduct occurred"); Menefee v. State, 640 P.2d 1381, 1384 (Okla. Crim. App. 1982) (noting, without regard to its exclusionary rule, that "it is well established in federal and other state jurisdictions that the law of the state in which a warrantless arrest takes place determines the validity of the arrest") (citations omitted); accord State v. Cooper, 573 P.2d 1006, 1008 (Kan. 1977).

It is manifest that Hawaiʻi courts are bound to follow the Constitution of Hawaiʻi. Thus, with regard to judicial integrity, Bridges failed to consider that if state courts admitted evidence in a state prosecution that was obtained in a manner that would be unlawful under our constitution, our courts would necessarily be placing their imprimatur of approval on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts. This court has acknowledged that our exclusionary rule "recognize[s] that the courts of this State have the inherent supervisory power over criminal prosecutions to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts." Pattioay, 78 Hawaiʻi at 468, 896 P.2d at 924. In light of the foregoing considerations, we conclude that where the admission of evidence obtained in another jurisdiction would violate our constitution, the court must give substantial weight[21] to the

---

[21] Our courts regularly apply similar standards. See e.g., Russell v. Blackwell, 53 Haw. 274, 280, 492 P.2d 953, 957 (1972) ("The fact that the defendant was represented by counsel and acted after consultation with counsel is to be given substantial weight in determining the issue of voluntariness of plea.") (Internal quotation marks, parenthesis, ellipsis, and citations omitted.) (Emphasis added.); see also State v. Wakisaka, 102 Hawaiʻi 504, 514, 78 P.3d 317, 327 (2003) (stating that a defendant raising a claim of ineffective assistance of counsel has the burden of establishing "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense") (emphasis added); HRS § 706-625(3) (Supp. 2010) ("The court shall revoke probation if the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of the order or has been convicted of a felony.) (Emphasis added.) In plain language, "substantial" means "significantly great" and "considerable in quantity." Merriam Webster's Collegiate Dictionary 1174 (10th ed. 1989).

fact that such admission may compromise the judicial integrity of our courts.[22]

## B.

According to <u>Bridges</u>, a defendant's privacy rights are to be found within the realm of the situs court jurisprudence inasmuch as a defendant would ordinarily look to that jurisdiction to protect his or her privacy rights and would reasonably expect government conduct to conform to the laws of that jurisdiction. <u>See</u> 83 Hawaiʻi at 198-99, 925 P.2d at 368-69. This would seem to be logical where the case is tried in such a foreign jurisdiction so that protection would be afforded by the courts of that jurisdiction. However, <u>Bridges</u> also indicated that a defendant's privacy rights may be defined under the Hawaiʻi Constitution inasmuch as "one could argue" that evidence obtained lawfully in Hawaiʻi under federal law but in violation of Hawaiʻi law should be suppressed in a state prosecution. <u>Id.</u> at 199 n.15, 925 P.2d at 369 n.15.

This court has determined that "'[u]nlike the exclusionary rule on the federal level, Hawaiʻi's exclusionary rule serves not only to deter illegal police conduct, but to protect the privacy rights of our citizens.'" <u>State v. Kahoonei</u>, 83 Hawaiʻi 124, 131, 925 P.2d 294, 301 (1996) (quoting <u>Lopez</u>, 78

---

[22] We note that, where evidence is recovered in another jurisdiction, there may be circumstances in which an intrusion upon a defendant's privacy rights, as defined by Hawaiʻi law, may be of a minimal nature, such that admission of the evidence would not substantially weigh on judicial integrity.

Hawaiʻi at 445, 896 P.2d at 901); see also State v. Dixon, 83 Hawaiʻi 13, 23, 924 P.2d 181, 191 (1996) (stating that "article I, section 7 of the Hawaiʻi Constitution provides broader protection than the [F]ourth [A]mendment to the United States Constitution because it also protects against unreasonable invasions of privacy"); State v. Navas, 81 Hawaiʻi 113, 123, 913 P.2d 39, 49 (1996) (stating that "article I, section 7 of the Hawaiʻi Constitution" provides a "more extensive right of privacy . . . than that of the United States Constitution"); State v. Tanaka, 67 Haw. 658, 662, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawaiʻi Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."); Hanson I, 97 Hawaiʻi at 82, 34 P.3d at 12 ("The Hawaiʻi Supreme Court has concluded that a person's expectation of privacy under article 1, § 7 of the Hawaiʻi Constitution is greater than that under the [F]ourth [A]mendment to the United States Constitution.") (Citation omitted.) Because our exclusionary rule is unlike the exclusionary rules of the federal government and some other jurisdictions insofar as it guarantees individual privacy rights, consideration of the Hawaiʻi Constitution and applicable case law is mandated.

Consequently, it would seem apparent that the question of whether or not the privacy rights of a defendant who is tried in our courts and under our penal law have been violated, should not be governed by the law and constitution of jurisdictions that

have deemed privacy rights irrelevant.[23]  To reiterate, our exclusionary rule seeks to protect the individual privacy rights of the defendant.  Because those rights necessarily stem from our state constitution, our exclusionary rule analysis requires the defendant's privacy rights, as defined by the Hawaiʻi Constitution and applicable case law, be given substantial weight when another jurisdiction's law is involved.

C.

The final purpose of the exclusionary rule is deterrence.  This court has defined deterrence as "the expectation that after evidence is suppressed based on [a] particular police conduct[,] . . . in the future, police officers will refrain from that type of conduct."  Bridges, 83 Hawaiʻi at 199, 925 P.2d 369.  It is plain that the suppression of evidence obtained by Hawaiʻi law enforcement officers in another jurisdiction, where such evidence was unlawfully seized under the laws or Constitution of Hawaiʻi, would deter Hawaiʻi law enforcement officers from engaging in that type of conduct in the future.

In this instance, however, as the ICA explained, "[b]ecause no Hawaiʻi law enforcement officer was involved[,] . . . there was no possible misconduct by Hawaiʻi law enforcement

---

[23]   It may be noted that applying the laws of the situs may be difficult, if not impossible, where the jurisdiction has no law that could resolve the issues raised in a defendant's motion to suppress inasmuch as the courts of this state have no authority to declare the laws of another jurisdiction.

officers to deter." Torres, 122 Hawaiʻi at 19, 222 P.3d at 426.

The ICA thus held that "[a]pplying Hawaiʻi law to suppress the

results of the searches would have little, if any, deterrent

effect on the federal officers." Id. However, the application

of the Hawaiʻi exclusionary rule factors in future cases would

deter any federal and state cooperation "to evade state law."

Friesen, supra, § 11-3(d)(3). In sum, considerations of judicial

integrity, individual privacy, and deterrence apply to

Petitioner's motion to suppress.

                              IX.

       As indicated, Bridges does not reflect a consistent

application of the exclusionary rule analysis.[24] Therefore, it

is overruled insofar as it is inconsistent with this opinion.

Hence, we must respectfully disagree with the ICA's analysis in

the instant case insofar as it relied on Bridges. We therefore

conclude that, where evidence sought to be admitted in state

court is the product of acts that occurred on federal property or

in another state, by Hawaiʻi law enforcement officers or officers

of another jurisdiction, due consideration, as we have set forth

---

[24] This court has said that Hawaiʻi's exclusionary rule serves to protect the privacy rights of persons within Hawaiʻi's jurisdiction, not only to deter illegal police conduct. See Lopez, 78 Hawaiʻi at 445, 896 P.2d at 901. Thus, if, as Bridges stated, the exclusionary rule analysis looks to the laws of the jurisdiction in which the conduct occurred, our courts would not need to consider whether the defendant's individual privacy rights had been compromised when such evidence is introduced in a Hawaiʻi state prosecution. Hence, Bridges' consideration of only the foreign state's law rendered the application of the exclusionary rule analysis in that case internally inconsistent, insofar as Bridges stated that individual privacy rights under the Hawaiʻi Constitution should be considered.

33

herein, must be given to the Hawaiʻi Constitution and applicable case law.

X.

A.

We next consider whether the searches of Petitioner's vehicle were valid under the Hawaiʻi Constitution, notwithstanding the fact that they were lawful under the United States Constitution.  In the instant case, we agree with the court's conclusion that Petitioner's conduct of driving onto PHNB demonstrated that he consented to a search of his person and property under his control.  See conclusion 5.

"[C]onsent is an exception to and dispenses with the requirement of a warrant."  Hanson II, 97 Hawaiʻi at 76, 34 P.3d at 6 (citations omitted).  In Hanson II, when the defendant, scheduled to fly on a Hawaiian Airlines flight, arrived at the Hawaiian Airlines ticket counter to check in, a Honolulu Airport security officer placed the defendant's toolbox through an "x-ray" machine but was unable to identify everything within the toolbox.  Id. at 72, 34 P.3d at 2.  When the defendant opened the tool box for the security officer, a tan plastic bag wrapped in duct tape was discovered, the contents of which could not be identified.  Id.  The security officer opened the plastic bag and discovered a second plastic bag.  That bag contained a white cardboard box from which a black handgun was recovered.  Id.  The defendant, who was charged with failing to register a firearm,

moved to suppress all evidence obtained as a result of the search. Id.

Although the defendant did not expressly indicate that he consented to a search of his toolbox or the contents therein, this court held that inasmuch as "[c]onsent may also be implied from an individual's words, gestures, or conduct[,]" the defendant had consented to the search of his tool box in voluntarily surrendering it for inspection. Id. at 75, 34 P.3d at 5 (internal quotation marks and citations omitted). Hanson II explained that "implied consent to an airport security search may be imputed from posted notices" and "the nature of airport security measures." Id. (citations omitted). This court additionally held that "[b]ecause the purpose of a security inspection can only be effectuated if the items subject to search can be identified, searches of such belongings must reasonably extend to those containers whose contents cannot be discerned." Id.

As in Hanson II, in the instant case, there was a clear and visible sign at the entrance of PHNB which stated: "Authorized Entry Onto This Installation Constitutes Consent To Search Of Personnel And The Property Under Their Control. Internal Security Act of 1950 Section 21; 50 U.S.C. 7979." Finding 6. Any person who, after reading the sign, decided not to consent to a search of his or her person or property, could turn around and leave without having his or her person or

property searched. See finding 8. The guard shack, which a person would have passed in order to gain entrance to the base, was located approximately 50 feet beyond the sign, giving a person ample opportunity to turn around if he or she did not want to be subjected to a search of his or her person or property. See finding 9.

According to Petitioner, although there was a sign posted 50 feet before the entrance to PHNB, he was not given the opportunity to decide whether to enter PHNB and turn around at the guard shack because Officer Aguilar "waved him down as he was entering the gate and then stopped his car just after the guard shack." However, in his Application, Petitioner did not challenge any of the findings of the court, and, therefore, such findings are binding on this court. In any event, there is nothing to suggest that Petitioner indicated to Officer Aguilar in any way, that he did not want to enter PHNB and instead, wished to turn around at the guard shack. Officer Aguilar saw Petitioner in his vehicle, waiting to enter PHNB, and Petitioner did in fact enter PHNB. See findings 16, 17. It was only after Petitioner entered PHNB that Officer Aguilar motioned for him to stop his vehicle, and only after he was informed that NCIS wanted to talk to him about the incident that Petitioner began to struggle to restart the vehicle, in a seeming attempt to exit PHNB. See finding 17, 18.

Inasmuch as "[c]onsent may . . . be implied from an individual's words, gestures, or conduct[,]" <u>Hanson II</u>, 97 Hawaiʻi at 75, 34 P.3d at 5, we conclude that Petitioner's consent to the search of his vehicle may be implied from his act of driving past the guard shack and onto PHNB, and imputed from the posted notice indicating that entry onto PHNB constituted consent to a search.[25]

B.

Petitioner noted that Sergeant Rozkiewicz and Officer Aguilar testified there were search directives for random searches.  We find federal search directives irrelevant in this case inasmuch as we conclude that the inspection of Petitioner's vehicle was valid based on Petitioner's implied consent to such search.

---

[25]    Federal courts have likewise held that consent to a search of one's vehicle may be implied from entry onto a closed military base.  <u>See Morgan v. United States</u>, 323 F.3d 776, 778 (9th Cir. 2003) (stating that because military bases "often warn of the possibility of search as a condition to entry, a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched"); <u>Jenkins</u>, 986 F.2d at 79 (stating that "[c]onsent is implied by the totality of all the circumstances[,]" including "[t]he barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base[,]" all of which "combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base[]") (internal quotation marks and citations omitted); <u>United States v. Ellis</u>, 547 F.2d 863, 864 (5th Cir. 1977) ("Consent to search a motor vehicle while on board a Naval Air Station was validly obtained through issuance, acceptance and display of a visitor's pass" and therefore, "marijuana disclosed by a warrantless search made pursuant to this consent was legally obtained"); <u>United States v. Mathews</u>, 431 F. Supp. 70, 73 (D.C. Okla. 1976) (concluding that because there were signs at the entrance of the air force base indicating the property or personnel within the control of those entering the base may be subject to search, "defendants had consented to their vehicle and persons being searched by entering the Military Reservation").

Also, Petitioner does not point to any directive alleged to have been violated. The court's unchallenged finding indicates that "[a]fter moving the vehicle, [Sergeant] Rozkiewicz followed base police procedures in securing the vehicle, which required police to check a vehicle that was going to be left unattended on base, for flammable or volatile substances such as gasoline, kerosene and explosives." Finding 23.[26] For the reasons set forth supra, we likewise conclude that the inspection of Petitioner's vehicle by Sergeant Rozkiewicz was not unreasonable under the Hawaiʻi Constitution.

## XI.

Having determined that the inspection of Petitioner's vehicle by Sergeant Rozkiewicz was not unreasonable under the Hawaiʻi Constitution, we consider the legality of the second search of Petitioner's vehicle. In his Application, Petitioner's only argument with respect to the second search is that it was

---

[26] Federal courts generally uphold searches that take place on closed military bases as reasonable, without regard as to whether conducted pursuant to federal search directives or procedures, and even in the absence of any particularized suspicion. Jenkins, 986 F.2d at 78 (stating that "searches on closed military bases have long been exempt from the usual Fourth Amendment requirement of probable cause") (citations omitted); Ellis, 547 F.2d at 866 (stating that "[t]he right to make a search [on a closed military base] pursuant to [] consent does not turn on the presence of probable cause"); United States v. Rogers, 549 F.2d 490, 493 (8th Cir. 1976) (upholding a warrantless search of the defendant's vehicle based on exigent circumstances, and explaining that "because the search occurred on . . . a closed military base, there is even less reason to question the propriety of the search"); United States v. Vaughan, 475 F.2d 1262, 1264 (10th Cir. 1973) (stating that once the defendant entered the closed military base, "a search conducted without probable cause and without consent could be proper" and "the submission to search could be imposed as a valid condition to gaining access to the base"); United States v. Grisby, 335 F.2d 652, 654-55 (4th Cir. 1964) (stating that "[t]he authority . . . of a military picket to search any automobile entering a military reservation is widely recognized and has been judicially upheld").

"tainted" by the first search, i.e., the inspection of Petitioner's vehicle by Sergeant Rozkiewicz. According to Petitioner, "[i]f the first search was unconstitutional, [Respondent] must show that the subsequent search is not the fruit of the prior search" or at least, "the dissipation of the taint." (Internal quotation marks and citation omitted.) Petitioner maintains that because "the affidavit submitted in support of the Command Authorization relied heavily on [Sergeant] Rozkiewicz's statements regarding his observations during the first search[,]" the search conducted pursuant to the Command Authorization "was still tainted by the prior illegal search and was therefore invalid." (Citation omitted.)

With respect to Petitioner's argument that the second search was the "fruit" of or tainted by the inspection of his vehicle by Sergeant Rozkiewicz, because we have held that the first search did not violate the Hawaiʻi Constitution, it follows that the evidence obtained pursuant to the Command Authorization was neither the "fruit" of an unlawful search, nor tainted by the inspection of Petitioner's vehicle by Sergeant Rozkiewicz. Alternatively, by entering onto PHNB, Petitioner consented to the second search of his vehicle as well as the inspection of his vehicle by Sergeant Rozkiewicz.

## XII.

Inasmuch as Petitioner's privacy rights under the Hawaiʻi Constitution were not invaded by the searches in this

case, the individual privacy rights prong of our exclusionary rule analysis does not weigh in favor of suppression. In that vein, judicial integrity would not be compromised. Thus, the evidence is admissible against Petitioner in his re-trial.

XIII.

Petitioner's third question in his Application contends that the ICA's decision was inconsistent with Gant, -- U.S. at --, 129 S.Ct. at 1714, and that the ICA gravely erred in determining that other exceptions to the warrant requirement applied in the instant case. It is observed that Gant has raised some questions about the viability of the Supreme Court's holding in New York v. Belton, 453 U.S. 454, 460 (1981), "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (Footnotes omitted.)

In Gant, the defendant "was arrested for driving [with] a suspended license, handcuffed, and locked in a patrol car before officers searched his car and found cocaine in a jacket pocket." -- U.S. at --, 129 S.Ct. at 1714. The Court held "that Belton does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." Id. Gant additionally "conclude[d] that circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to

believe that evidence of the offense of arrest might be found in the vehicle." Id.

As indicated previously, we affirm the ICA's decision insofar as it upheld the searches of Petitioner's vehicle as valid under federal law and the United States Constitution. We observe that the ICA did not determine that any of the searches of Petitioner's vehicle were justified on the ground that the search was incident to a lawful arrest and so did not consider Gant. In any event, Gant is not applicable to the instant case inasmuch as it is distinguishable. Unlike in Gant, the searches of Petitioner's car took place on a closed military base such that consent to such searches may be implied. Morgan, 323 F.3d at 778 (holding that "consent to a search of one's vehicle may be implied from entry onto a closed military base"); see also Jenkins, 986 F.2d at 79 (stating that "[c]onsent is implied by the totality of all the circumstances[,]" including "[t]he barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base[,]" all of which "combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base[]"). Because we have concluded that upon entering PHNB Petitioner impliedly consented to a search of himself and his property, we need not reach the issues raised in Gant with respect to the Hawaiʻi Constitution.

41

XIV.

Based on the foregoing, we correct the ICA's opinion insofar as it concluded that federal law alone was to be considered in ruling on Petitioner's motion to suppress.  We affirm the December 5, 2006 order of the court denying Petitioner's motion to suppress under federal law and the Hawaiʻi Constitution.  The January 7, 2010 Judgment of the ICA is accordingly affirmed.

| | |
|---|---|
| Cynthia A. Kagiwada for petitioner and respondent/ defendant-appellant. | /s/ Simeon R. Acoba, Jr. |
| | /s/ James E. Duffy, Jr. |
| Deirdre Marie-Iha, Deputy Solicitor General, and | /s/ Richard W. Pollack |
| Susan Y.N. Won, Deputy Attorney General, State of Hawaiʻi, for respondent and petitioner/plaintiff-appellee. | /s/ Patrick W. Border |

