**Electronically Filed
Supreme Court
SCWC-28901
31-DEC-2013
09:43 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee-Cross-Appellant,

vs.

ROBERT J. MCKNIGHT, JR.,
Petitioner/Defendant-Appellant-Cross-Appellee.

_____

SCWC-28901

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NOS. 28431 & 28901; CR. NO. 06-1-0352(1))

December 31, 2013

RECKTENWALD, C.J., NAKAYAMA, ACOBA, AND McKENNA, JJ., AND
CIRCUIT JUDGE TRADER, IN PLACE OF DUFFY, J., RECUSED

OPINIONS OF THE COURT

INTRODUCTION
(By: McKenna, J., with whom Recktenwald, C.J., Nakayama, and
Acoba, JJ., and Circuit Judge Trader join)

On July 24, 2006, Robert J. McKnight, Jr. ("McKnight")
was charged via indictment with Count 1, Electronic Enticement of
a Child in the First Degree, in violation of Hawaiʻi Revised
Statutes ("HRS") § 707-756 ("Electronic Enticement"), and Count
2, Promoting Child Abuse in the Third Degree, in violation of HRS

§ 707-752(1)(a).  The charges were severed, and the State of Hawaiʻi ("State") proceeded to trial on Count 1.  After a jury trial in the Circuit Court of the Second Circuit ("circuit court"),[1] McKnight was convicted of Electronic Enticement.

McKnight appealed his conviction for Electronic Enticement, and the State cross-appealed the suppression of certain evidence, including a statement made by McKnight after he was arrested and evidence seized from his residence pursuant to a misdated search warrant.  Some of this evidence pertained to the untried charge of Promoting Child Abuse in the Third Degree.  The Intermediate Court of Appeals ("ICA") affirmed McKnight's conviction and vacated the circuit court's suppression order.

McKnight raises three questions on certiorari, printed in the order addressed:

> [1]. Did the ICA gravely err by disregarding the plain and unambiguous language of a criminal statute and holding that proof that the defendant used a computer or other electronic device was not part of each element of the offense?
>
> 2. Did the ICA gravely err in holding that Mr. McKnight waived his right to counsel after he asserted his constitutional and statutory rights and the police made no effort to find a lawyer, denied his right to contact his mother, and wanted to question him further?
>
> [3]. Did the ICA gravely err when it created a new exception to Hawaiʻi's exclusionary rule by holding that the use of evidence seized pursuant to an invalid warrant does not violate the right to be free from unreasonable searches, seizures, and invasions of privacy guaranteed by the Hawaiʻi Constitution?

---

[1]     The Honorable Joel E. August presided.

Pursuant to the analysis below, we affirm in part and vacate in part the ICA's Judgment on Appeal, and remand this case for further proceedings consistent with this opinion.

A.   Factual Background

The charges against McKnight stemmed from an undercover investigation conducted by the Department of the Attorney General.  During the investigation, McKnight began communicating via internet chat with "Chyla Bautista" ("'Chyla'"), a persona created by Special Agent Vincente Domingo ("Agent Domingo") of the Hawaiʻi Internet Crimes against Children Task Force.  "Chyla" identified herself as a fifteen-year-old girl on Oʻahu.  Over the course of a month, McKnight communicated with "Chyla" via Yahoo!! Messenger ("Yahoo"), email, cellular telephone, and home telephone.  During these conversations, McKnight discussed meeting with "Chyla" and performing sexual acts with her.  He also emailed "Chyla" photographs of himself and displayed himself to "Chyla" masturbating via webcam.

On July 5, 2006, McKnight communicated with "Chyla" via Yahoo to discuss meeting her in person.  McKnight purchased an electronic airline ticket and arranged to fly "Chyla" from Honolulu to Maui the following day.  He provided "Chyla" with the flight information, told her that he would pick her up from the airport, and gave her a description of his car.  On July 6, 2006,

the Maui Police Department and the Hawaiʻi Attorney General's Office observed McKnight's car entering Kahului Airport at the scheduled arrival time and placed McKnight under arrest for electronic enticement of a child.

At the Wailuku Police Station, Agent Domingo advised McKnight of his <u>Miranda</u> rights and asked him to complete a constitutional rights form (AG Form CR-1). McKnight stated that he wanted an attorney and initialled "Yes" next to a question that read "Do you want an attorney now?" Agent Domingo ceased the interview and left the room to confer with Agent Woletta Kim ("Agent Kim") regarding whether he could ask McKnight for a description of his residence. The agents, who intended to obtain a search warrant for the residence, concluded that such questioning was permissible because it did not involve interrogating McKnight about the case. Agent Domingo returned to the interview room minutes later with the intention of further questioning McKnight.

When Agent Domingo re-entered the room, McKnight asked to call his mother, but Agent Domingo denied the request.[2] McKnight asked what was going to happen next, and Agent Domingo

---

[2]    Upon further questioning, Agent Domingo acknowledged that McKnight could have requested an attorney or asked his mother to hire an attorney; however, he did not know McKnight's reasons for wanting to call his mother, and he was concerned that McKnight would ask his mother to dispose of evidence before agents could obtain a search warrant.

4

responded, "[W]e are going to do a search warrant on [your] residence."[3]  At that point, McKnight stated that he had changed his mind about giving a statement because he had not realized the severity of the crime.

As Agent Domingo began tape-recording their dialogue, however, McKnight again asked if he could call his mother.  Agent Domingo responded that he could not promise anything, and it was entirely McKnight's decision whether he wanted to give a statement.  The transcript reveals the following exchange:

> ROBERT J. MCKNIGHT, JR.: . . . . Now, will – after this is done, will you allow me to call my mother?
> SPECIAL AGENT DOMINGO: Again, I'm not going to promise you anything. [] If you want to give a statement or not, that's strictly up to you. . . . I can't promise you anything. There's no promises or guarantees, okay, at this stage.
> ROBERT J. MCKNIGHT, JR.: Okay.
> SPECIAL AGENT DOMINGO: Do you still want to talk to me?
> ROBERT J. MCKNIGHT, JR.: Not unless I go let my mother know.
> SPECIAL AGENT DOMINGO: Again, I can't promise you anything. . . . I can't say, okay, I will -- I will let you do this if you give me a statement. . . . There's no promises, no guarantees.  If you want to give me a statement -- like you told me that, you know, you changed your mind because you didn't realize the severity of the crime, then fine.  But, again, I can't promise you anything.  You have got to tell me what you want to do, Robert.
> ROBERT J. MCKNIGHT, JR.: Go ahead.
> . . . .
> SPECIAL AGENT DOMINGO: Go ahead what?
> ROBERT J. MCKNIGHT, JR.: Continue.

(Emphasis added).

When McKnight agreed to continue, Agent Domingo presented him with a second constitutional rights form, on which

---

[3]     Agent Domingo admitted that a search warrant had not yet been prepared but their intention was to apply for one.

McKnight indicated that he did not want an attorney and that he wanted to give a statement.  After McKnight completed this form, Agent Domingo proceeded to question McKnight about his conversations with "Chyla" and his intention to meet with her.

That afternoon, Agent Domingo prepared a search warrant for McKnight's residence and vehicle.  He presented the warrant application and his affidavit to Judge Simone Polak of the District Court of the Second Circuit.  After finding probable cause, Judge Polak signed the warrant, which authorized agents to search McKnight's residence and vehicle for evidence of Electronic Enticement, and to seize computers and electronic storage media (e.g., hard drives, modems, digital files, electronically stored records, computer programs, and photographic equipment).  The warrant stated: "This warrant may be served and the search made on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant[.]"  In a clerical error, however, Judge Polak misdated the warrant as having been signed by her on June 6, 2006.[4]

Agents executed the search warrant that same day at McKnight's residence and seized, among other things, two computer

---

[4]     The June 6, 2006 date in the jurat was handwritten by Judge Polak upon issuing the warrant, while the July 16, 2006 date in the final paragraph had been typed by Agent Domingo when he prepared the search warrant application.

hard drives, thirty-five floppy disks, and twenty-two DVDs. Subsequent imaging of the hard drives revealed approximately one hundred and fifty-five electronic images and two movies of suspected child pornography, archived files of conversations between McKnight and "Chyla," and graphic files of McKnight displaying his genitals.

B.    The Charge and Trial

The Circuit Court of the Second Circuit granted McKnight's pretrial motions to suppress the statement he gave after invoking his right to counsel and evidence seized pursuant to the misdated search warrant ("Suppression Order").[5]  After its motion to sever the charges was granted, the State proceeded to trial on Count 1, Electronic Enticement in the First Degree, and appealed the court's Suppression Order as it related to Count 2, Promoting Child Abuse in the Third Degree.

---

[5]    On October 25, 2006, McKnight Filed a Motion to Suppress Statement as Involuntary, on the ground that Agent Domingo had violated his right to counsel, and a Motion to Suppress Evidence Seized Pursuant to Invalid Warrant, on the ground that the warrant was not supported by probable cause.  The State filed memoranda in opposition to both motions; and the court conducted an evidentiary hearing on December 8, 2006.  After this hearing, McKnight alerted the court to the error in the date on the search warrant and filed a Supplemental Memorandum in Support of his Motion to Suppress Evidence.  The State filed a Memorandum in Opposition to Defendant's Supplemental Memorandum, arguing that the issuance date was merely a clerical error and that the warrant should be upheld under the good faith exception.  On February 1, 2007, the circuit court issued its Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Suppress Statement as Involuntary and Granting Defendant's Motion to Suppress Evidence Seized Pursuant to Invalid Warrant. With respect to the warrant issue, the circuit court stated that there was probable cause for the search warrant, but suppressed the evidence seized because of the misdating of the warrant pursuant to the ICA's holding in State v. Endo, 83 Hawaiʻi 87, 924 P.2d 581 (App. 1996), discussed infra.

7

At the conclusion of the trial on the Electronic Enticement charge, the court gave the following jury instruction, over McKnight's objections:[6]

> In the indictment, Defendant Robert McKnight is charged with the offense of electronic enticement of a child in the first degree.
>
> A person commits the offense of Electronic Enticement of a Child in the First Degree if he intentionally or knowingly uses a computer or any other electronic device to intentionally or knowingly communicate with another person, who represents that person to be under the age of eighteen years, with the intent to promote or facilitate the commission of Sexual Assault in the First Degree or Sexual Assault in the Third Degree, and intentionally or knowingly agrees to meet with another person who represents that person to be a minor under the age of eighteen years, and intentionally or knowingly travels to an agreed upon meeting place at an agreed upon meeting time.
>
> There are five material elements of the offense of Electronic Enticement of a Child in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These five elements are:
>
> 1.    That on or about the 13th day of June 2006, to and including the 6th day of July, 2006, in the County of Maui, State of Hawaii, Defendant[] intentionally or knowingly used a computer or other electronic device; and
>
> 2.    That the Defendant intentionally or knowingly used a computer or other electronic device to communicate with another person, who represented that person to be under the age of eighteen years; and
>
> 3.    That Defendant communicated with the other person with the intent to promote or facilitate the commission of Sexual Assault in the First Degree or

_____

    [6]    McKnight objected on the grounds that the jury should not be instructed as to Sexual Assault in the Third Degree, and that the State must prove beyond a reasonable doubt that the character "Chyla" was below the age of 16.  He did not argue, however, that Electronic Enticement required the State to prove that he used a computer or electronic device to agree to meet with "Chyla" and to travel to the agreed-upon meeting place at the agreed-upon time; in addition, his own proposed jury instruction did not extend this computer-use requirement to the three conduct elements of the offense.

8

with the intent to promote or facilitate the
commission of Sexual Assault in the Third Degree; and
4.    That the Defendant intentionally and knowingly
agreed to meet with another person who represented
that person to be under the age of eighteen years; and

5. That the Defendant intentionally or knowingly
traveled to an agreed upon meeting place at an agreed
upon meeting time.

A person commits the felony offense of Sexual Assault
in the First Degree if he knowingly engages in sexual
penetration with a minor who is at least fourteen years old
but less than sixteen years old and the person is not less
than five years older than the minor and the person is not
legally married to the minor. . . .

A person commits the felony offense of Sexual Assault
in the Third Degree if he knowingly engages in sexual
contact with a minor who is at least fourteen years old but
less than sixteen years old or causes a minor who is at
least fourteen years old but less than sixteen years old to
have sexual contact with him, and the person is not less
than five years older than the minor, and the person is not
legally married to the minor. . . .

(Emphasis added.)

A jury found McKnight guilty as charged of Electronic

Enticement.  The circuit court entered its judgment of conviction

and sentence of probation on November 14, 2007 ("Judgment").

McKnight appealed this Judgment.

C.    Appeals to the ICA

1.    McKnight's Appeal from the Judgment

On appeal, McKnight argued for the first time that the

circuit court plainly erred in failing to instruct the jury that

the State was required to prove that he used a computer or

electronic device to accomplish each of the three elements of

9

Electronic Enticement, including agreeing to meet with "Chyla" and traveling to Kahului airport.[7]

The State argued, inter alia, that McKnight's interpretation of the statute would be contrary to legislative intent and lead to an absurd result because it was not possible to travel via a computer and anyone who traveled to a meeting via car, airplane, or foot would be immune from prosecution. The State did not explain how imposing a computer-use requirement on the agreement to meet would render the statute absurd.

In response, McKnight contended that the plain language of the statute required the use of a computer or electronic device as to every element, and that this interpretation was not absurd because the State could have convicted him if he had used a computer to purchase an airline ticket to travel to Oʻahu to meet with "Chyla."

2. <u>State's Appeal from the Suppression Order</u>

In its appeal from the Suppression Order, the State argued that the court erred in suppressing McKnight's statement because McKnight had initiated communication with Agent Domingo,

---

[7]     McKnight also argued on appeal that the circuit court abused its discretion in permitting the jury to view scenes of him masturbating for "Chyla" via web cam, and that there was insufficient evidence to support his conviction because the State failed to prove that he used a computer or other electronic device to travel to the airport to meet "Chyla." The ICA held that the court did not abuse its discretion in allowing the jury to view the videos, and McKnight's claim regarding insufficiency of the evidence was without merit. McKnight did not challenge these portions of the ICA's Opinion on certiorari and, therefore, we do not address them in our decision.

10

and had voluntarily and knowingly waived his <u>Miranda</u> rights before being questioned.  In addition, it maintained that Agent Domingo's failure to make any efforts to contact an attorney and his denial of McKnight's requests to contact his mother did not amount to a violation of McKnight's constitutional or statutory rights.  The State also argued that the court erred in suppressing evidence seized pursuant to the misdated search warrant because the error had been committed by the issuing judge rather than law enforcement agents, McKnight was not prejudiced where the search was otherwise supported by probable cause, the public's interest in obtaining evidence of crimes against children outweighed the marginal benefits of suppressing such evidence, and a narrow application of the good faith exception was warranted under such circumstances.

McKnight, on the other hand, argued that his statement was not voluntarily given because he had unequivocally invoked his right to counsel, his inquiry as to what was going to happen next did not evidence a desire to reinitiate a discussion regarding the investigation, and Agent Domingo's statement about executing a search warrant was reasonably likely to elicit an incriminating response.  McKnight also argued that the error in the issuance date of the search warrant rendered it invalid, and execution of the warrant constituted an invasion of his right to privacy.

11

### 3. The ICA's Opinion

In a published opinion, the Intermediate Court of Appeals ("ICA") affirmed McKnight's conviction under HRS § 707-756, vacated the circuit court's Suppression Order, and remanded the case for further proceedings.[8]

With respect to McKnight's appeal, the ICA concluded that the circuit court did not plainly err in failing to instruct the jury that HRS § 707-756 required the State to prove that McKnight used a computer or other electronic device to agree to meet "Chyla" or to travel to the agreed-upon meeting place at the agreed-upon time. It concluded that construing the statute otherwise would lead to illogical and inconsistent results by limiting application of the statute to atypical situations.

With respect to the State's appeal, the ICA overruled its prior decision in State v. Endo, 83 Hawaiʻi 87, 924 P.2d 581 (App. 1996),[9] and concluded that a clerical error in the issuance date of the search warrant did not require suppression of evidence seized pursuant thereto because suppressing the evidence

---

[8]    The ICA consolidated McKnight's appeal from the Judgment and the State's appeal from the Suppression Order under ICA No. 28901.

[9]    In Endo, a police officer erroneously typed the date of April 14, 1992 on a search warrant he presented to a judge for signature on May 14, 1992. 83 Hawaiʻi at 88-89, 924 P.2d at 582-83. The ICA held that misdating the warrant rendered it invalid, noting, inter alia, that Hawaiʻi Rules of Penal Procedure Rule 41(c) required the search warrant to "command the officer to search within a specified period of time not to exceed ten (10) days[,]" and that the warrant commanded the officer to search "for a period not to exceed ten (10) days from its issuance." Id. at 92-94, 924 P.2d at 586-88.

under such circumstances would neither deter governmental misconduct or protect citizens' privacy rights in such circumstances. In addition, the ICA concluded that McKnight's custodial statement to Agent Domingo should not have been suppressed because, although McKnight had earlier invoked his right to counsel, he then reinitiated communication with agents and voluntarily waived his <u>Miranda</u> rights.

PART I: HRS § 707-756 DOES NOT REQUIRE THE STATE TO PROVE THAT MCKNIGHT USED A COMPUTER OR ELECTRONIC DEVICE TO TRAVEL TO THE AGREED-UPON MEETING PLACE OR TO AGREE TO MEET WITH "CHYLA" (By: McKenna, J., with whom Nakayama and Acoba, JJ., join)

We construe the Electronic Enticement statute pursuant to established principles of statutory construction, and hold that the State was not required to prove that McKnight used a computer or other electronic device either (1) to travel to the agreed-upon meeting place at the agreed-upon time, or (2) to agree to meet with a person representing him- or herself to be under the age of eighteen years. We therefore affirm McKnight's conviction for Electronic Enticement under HRS § 707-756.

At the time pertinent to this case, HRS § 707-756 (Supp. 2006) provided, in relevant part:

> (1) <u>Any person</u> who, <u>using a computer or any other electronic device</u>:
>> (a) <u>Intentionally or knowingly communicates</u>:
>>> (i) With a minor known by the person to be under the age of eighteen years;
>>> (ii) With another person, in reckless disregard of the risk that the other person is under the age of eighteen years, and the other person is under the age of eighteen years; or

13

>        (iii) <u>With another person who represents that
>        person to be under the age of eighteen years</u>; <u>and</u>
>    (b) <u>With the intent to promote or facilitate the
>    commission of a felony</u>:
>        (i) That is a murder in the first or second
>        degree;
>        (ii) That is a class A felony; or
>        (iii) <u>That is an offense defined in section
>        846E-1</u>;
>    <u>Agrees to meet with the minor</u> or with another person
>    who represents that person to be a minor under the age
>    of eighteen years; <u>and</u>
>    (c) <u>Intentionally or knowingly travels to the agreed
>    upon meeting place at the agreed upon meeting time</u>;
>    is guilty of electronic enticement of a child in the
>    first degree.

(Emphasis added).[10]

McKnight argues that a conviction for Electronic Enticement requires the State to prove that he used a computer or other electronic device not only to communicate with a person who represents him- or herself to be under the age of eighteen years, but also (1) to travel to the agreed-upon meeting place at the agreed-upon meeting time, and (2) to agree to meet the minor, with the intent to promote or facilitate the commission of a felony under HRS § 846E-1. The State, on the other hand, maintains that HRS § 707-756 cannot be interpreted to require the use of a computer or electronic device to travel to a meeting place, because such a construction would create an absurd result, inconsistent with the legislature's purpose.

---

[10] The current version, HRS § 707-756 (Supp. 2012), contains the same language except subsection (1)(b)(iii) has been amended to read: "That is another covered offense as defined in section 846E-1." In addition, the word "and" between subsections (1)(a) and (1)(b) has been removed.

14

"The interpretation of a statute is a question of law reviewable de novo."  State v. Kotis, 91 Hawaiʻi 319, 327, 984 P.2d 78, 86 (1999) (citation, brackets, and ellipses omitted). We view HRS § 707-756 as a whole and construe the statute in accordance with the legislature's overall purpose to give each part a sensible and intelligent effect.  State v. Davis, 63 Haw. 191, 196, 624 P.2d 376, 380 (1981).  Based on the analysis below, we conclude that: (1) requiring the use of a computer or other electronic device to travel to the agreed-upon meeting place at the agreed-upon time would render the statute absurd in meaning; and (2) requiring the use of a computer or other electronic device to agree to meet with the minor would render the statute structurally incoherent as a whole.  We hold that, with respect to the computer-use requirement, the State was required to prove that McKnight used a computer or electronic device only to communicate with "Chyla"; therefore, the circuit court did not plainly err by not instructing the jury that the State must prove McKnight used a computer or electronic device to agree to meet with "Chyla" and to travel to the agreed-upon meeting place at the agreed-upon time.

A.   Legislative History of HRS § 707-756

"When construing a statute, [this court's] foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the

15

language contained in the statute itself." Kotis, 91 Hawaiʻi at 327, 984 P.2d at 86 (citation omitted). In addition, "we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." Id. (citation omitted). In determining the purpose of a statute, the court may look to the relevant legislative history to discern the underlying policy, which the legislature sought to promulgate. State v. Wells, 78 Hawaiʻi 373, 376, 894 P.2d 70, 73 (1995).

> [W]e have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

Keliipuleole v. Wilson, 85 Hawaiʻi 217, 221, 941 P.2d 300, 304 (1997) (citations, brackets, and ellipses omitted).

HRS §§ 707-756 and -757 were first introduced as House Bill 2426 during the 2002 legislative session. The articulated purpose of these statutes was "to deter crimes against minors by . . . creating two new offenses of first and second degree electronic enticement of a child, which prohibit the use of a computer or other electronic device to lure a minor to a meeting with intent to commit a felony[.]" H. Stand. Comm. Rep. No. 417, in 2002 House Journal, at 1399 (emphasis added). Specifically,

16

*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

the legislature expressed a concern regarding the predatory use of computers to target children, and it found that existing laws failed to address the use of new technologies to entice children into meetings for the purposes of committing crimes against them. S. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal, at 1384. It noted, however, that one method of investigation which had proven successful for targeting such crimes was the use of sting operations in which a police officer posed as a minor in chat rooms or e-mail communications with the sex offender.  Id.

> The Senate Standing Committee explained,
>
>> Your Committee finds that the use of the Internet to entice children into meetings has become widespread.  Current laws do not specifically address using computers to communicate with minors for purposes of committing crime.  This measure would close that loophole, and would allow sex offenders to be investigated and prosecuted before they commit a kidnapping or other crime.  One method of investigation that has been successful in arresting sex offenders before a child is hurt has been sting operations in which the sex offender's intended victim is actually a police officer posing as a minor in chat rooms or E-mail communications. Once the sex offender agrees to meet the child and goes to the meeting place, the offender is arrested.  However, the sex offender's defense to attempted sexual assault is often the defense of impossibility because the person posing as a child was not actually a child.  Therefore, it is important to criminalize the sex offender's predatory computer behavior, so that the offender can be prosecuted for what the offender has actually done, as opposed to what the offender might have been trying to do.

S. Stand. Comm. Rep. No. 2867, in 2002 Senate Journal, at 1384 (emphasis added).  Thus, the introduction of these bills enabled the State to prosecute predatory computer behavior where an individual engaged in online communications with a minor, agreed to meet with that person, and physically traveled to the

17

specified meeting place.  Id.  See also S. Stand. Comm. Rep. No. 3131, in 2002 Senate Journal, at 1498.

The statute that was ultimately enacted, HRS § 707-756, contained three distinct conduct elements: (1) the initial communication with the minor, (2) the agreement to meet with intent to commit a felony, and (3) the act of physically traveling to the agreed-upon place at the agreed-upon time. Viewing the statute in light of the underlying policy which the legislature sought to promulgate, it is apparent that each of these elements served a distinct purpose: requiring that the defendant utilize a computer or electronic device to communicate with a minor addresses the legislature's concern regarding the use of new technologies to target children; requiring that the agreement to meet be made with felonious intent ensures that the defendant has a culpable state of mind at the time he entices the child into meeting; and requiring that the defendant travel to an agreed-upon meeting place at an agreed-upon meeting time ensures that an individual is prosecuted only in situations where his behavior poses an actual physical threat to the child.

B.   Travel to an Agreed-Upon Meeting Place

McKnight argues that the circuit court erred in failing to instruct the jury that the State was required to prove that he used a computer or electronic device to travel to an agreed-upon meeting place at an agreed-upon meeting time.  We disagree and

conclude, as the ICA did, that extending the computer-use requirement to the act of traveling would be absurd.

Pursuant to established principles of statutory construction, the court will depart from a literal reading of a statute when the plain language results in an "absurd or unjust result" and is "clearly inconsistent with the purposes and policies of the statute."  State v. Park, 55 Haw. 610, 614, 525 P.2d 586, 589-90 (1974).  See also Keliipuleole, 85 Hawaiʻi at 221-22, 941 P.2d at 304-05 ("[A] rational, sensible and practical interpretation of a statute is preferred to one which is unreasonable or impracticable, because the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." (citations, internal quotation marks, and brackets omitted)).  Even where a statute appears unambiguous, the court may deviate from a literal application of the language in order to avoid absurdity and give effect to the legislature's intended purpose.  State v. Ogata, 58 Haw. 514, 518, 572 P.2d 1222, 1225 (1977).  See, e.g., State v. Stan's Contracting, 111 Hawaiʻi 17, 27-28, 137 P.3d 331, 341-42 (2006) (holding that a narrow interpretation of the word "fraud" in tolling statute would lead to absurd and unjust results); State v. Haugen, 104 Hawaiʻi 71, 76-77, 85 P.3d 178, 183-84 (2004) (holding that, although a statute regarding sentencing for first-time drug

19

offenders was "plain, obvious, and unambiguous" in its terms, construing the statute by its plain language would be inconsistent with, contrary to, and illogical in light of the legislature's intent in enacting the statute).

Although HRS § 707-756 structurally appears to require that a defendant use a computer or other electronic device to travel to an agreed-upon meeting place at an agreed-upon time, a literal reading of this paragraph is absurd. As the State correctly points out, computers are not modes of transportation that can be used to travel to a given location. In order to avoid absurdity, as required by the rules of statutory construction, we hold that the HRS § 707-756 does not require the State to prove that the defendant used a computer or electronic device to travel to the agreed-upon meeting place.

C.   The Agreement to Meet

McKnight also argues that the circuit court erred in failing to instruct the jury that the State was required to prove that he used a computer or electronic device to agree to meet with a person who represented herself to be under the age of eighteen years.[11] The ICA held that this interpretation of the statute would result in the same absurdity as requiring the use

---

[11]   McKnight did not contend on appeal that there was insufficient evidence to prove that he used a computer or electronic device to "agree[] to meet" a person claiming to be a minor; and the State presented evidence that the agreement to meet "Chyla" occurred via online chat.

20

of a computer to travel to a meeting place.  We disagree, because

it is conceivable to utilize a computer or other electronic

device (e.g., cellular phone or PDA) to agree to meet someone.

We conclude, however, that extending the computer-use requirement

to the agreement to meet is inconsistent with the overall

statutory structure of HRS § 707-756.

In construing each individual part of a statute, the

court must consider the statute as a whole to ensure that all

parts produce a harmonious and sensible whole.

> It is fundamental in statutory construction that each part
> or section of a statute should be construed in connection
> with every other part or section so as to produce a
> harmonious whole.  Statutes should be interpreted according
> to the intent and meaning, and not always according to the
> letter, and every part thereof must be viewed in connection
> with the whole so as to make all parts harmonize, if
> practicable, and give a sensible and intelligent effect to
> each.

Davis, 63 Haw. at 196, 624 P.2d at 380 (citation omitted).

At the time of McKnight's conviction, HRS § 707-756

(Supp. 2006) provided, in relevant part:

> (1) Any person who, using a computer or any other electronic
> device:
>     (a) Intentionally or knowingly communicates:
>         . . .
>         (iii) With another person who represents that
>         person to be under the age of eighteen years;
>         and
>     (b) With the intent to promote or facilitate the
>     commission of a felony:
>         . . .
>         (iii) That is an offense defined in section
>         846E-1;
>     Agrees to meet . . . with another person who
>     represents that person to be a minor under the age of
>     eighteen years; and
>     (c) Intentionally or knowingly travels to the agreed
>     upon meeting place at the agreed upon meeting time;

21

> is guilty of electronic enticement of a child in the
> first degree.

(Emphasis added).

Upon initial review, it appears the computer-use requirement in subsection (1) applies to (a) the act of communication, (b) the agreement to meet with intent to promote or facilitate a felony, and (c) the act of traveling to the agreed-upon meeting place at the agreed-upon meeting time. For the reasons noted earlier, however, we have already concluded that extending the computer-use requirement to (c) would be absurd. Imposing the computer-use requirement on the first two conduct elements but not the third renders the statute inconsistent in terms of its structure. In order to construe the statute as a harmonious whole, the computer-use requirement can only logically apply to (a), the act of communicating with a person who represents him- or herself to be under the age of eighteen years, and not to (b) or (c).

If the legislature had intended to extend the computer-use requirement to the agreement to meet, it could have structured the second subsection more naturally to read, "(1) Any person who, using a computer or any other electronic device: (a) . . . communicates . . . ; and (b) Agrees to meet . . . with another person who represents that person to be a minor under the age of eighteen years, with the intent to promote or facilitate the commission of a felony . . . ." To sensibly construe the

22

statute as written, we apply the computer-use requirement only to the act of communicating with the purported minor.[12] We therefore conclude that the circuit court did not err by not instructing the jury that the State was required to prove that McKnight used a computer or electronic device to agree to meet with "Chyla."

Accordingly, we affirm the ICA's Judgment on Appeal to the extent it affirmed McKnight's conviction on Count 1 for Electronic Enticement of a Child in the First Degree.

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ Sabrina S. McKenna



---

[12]     We believe this interpretation is also consistent with the legislature's subsequent decision to remove the word "and" between subsections (1)(a) and (1)(b).  See HRS § 707-756 (Supp. 2012).

23

PART II: SUPPRESSION OF MCKNIGHT'S STATEMENT WAS PROPER WHERE AGENTS FAILED TO OBTAIN A VOLUNTARY WAIVER OF HIS *MIRANDA* RIGHTS
(By: McKenna, J., with whom Recktenwald, C.J., Nakayama, and Acoba, JJ., and Circuit Judge Trader join)

We hold that McKnight's statement to Agent Domingo was obtained in violation of his constitutional right against self-incrimination, and that the circuit court properly suppressed this statement at trial.[13]

McKnight argues that the circuit court properly suppressed his statement to Agent Domingo because agents failed to obtain a valid waiver of his Miranda rights, and that the ICA erred in vacating the court's suppression order. The State contends that McKnight's statement was voluntarily given after McKnight initiated communication with Agent Domingo and waived his right to counsel; in addition, it argues that Agent Domingo's failure to immediately contact an attorney, his intention to further question McKnight, and his denial of McKnight's statutory right to call his mother did not detract from this voluntary waiver of rights.

---

[13] In addressing McKnight's motion to suppress, the circuit court found that Agent Domingo had also violated HRS §§ 803-9(2) and (4) by failing to make reasonable efforts to contact an attorney and refusing to allow McKnight to call his mother prior to questioning. It concluded that these statutory violations did not warrant suppression of McKnight's statement where McKnight failed to show a causal connection between the violations and his statement. The court concluded, however, that McKnight's statement must be suppressed because it was obtained in violation of his right to counsel.

As the ICA correctly noted, McKnight did not dispute the court's ruling that the statutory violations did not warrant suppression of his statement. Accordingly, we do not find it necessary to address this issue.

This court answers questions of constitutional law by exercising its independent judgment based on the facts of the case and reviewing such questions under the "right/wrong" standard.  State v. Jenkins, 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000).  We review the trial court's ruling on a motion to suppress de novo "to determine whether the ruling was 'right' or 'wrong.'"  Id. (citation omitted).  Where a defendant claims that a custodial statement was obtained in violation of his right against self-incrimination, this court reviews "the totality of the circumstances surrounding [his] statement" and "make[s] an independent determination of the ultimate issue of voluntariness."  State v. Kelekolio, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citation omitted).  We conclude, in view of the totality of the circumstances, that McKnight did not reinitiate communication with the agents and that his custodial statement was obtained without a voluntary waiver of his Miranda rights.

A.    The Right Against Self-Incrimination

Article I, section 10, of the Hawaiʻi Constitution and the Fifth Amendment of the United States Constitution both recognize the right against self-incrimination and require the State to show that certain procedural safeguards are taken to advise a criminal defendant of his constitutional rights before custodial statements may be used against him as direct evidence or impeachment evidence.  State v. Ketchum, 97 Hawaiʻi 107, 116,

25

34 P.3d 1006, 1015 (2001). Specifically, a defendant must be advised of his right to remain silent, the fact that anything he says may be used as evidence against him, his right to an attorney, and the fact that an attorney will be appointed for him if he cannot afford one. Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); accord State v. Nelson, 69 Haw. 461, 467-68, 748 P.2d 365, 369 (1987).

When a defendant makes an unequivocal request for counsel during custodial interrogation, all questioning must cease until counsel is present or until the defendant himself reinitiates further conversation. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ("[A]n accused, . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

B.   Voluntary, Knowing, and Intelligent Waiver of Rights

Once a defendant invokes his right to counsel, the police must cease all interrogation. See Ketchum, 97 Hawaiʻi at 119-21, 34 P.3d at 1018-20 (explaining that "interrogation" includes any words or conduct "that the officer knows or reasonably should know is likely to elicit an incriminating

26

response").[14]  In order to determine whether a statement constitutes interrogation, the court must objectively assess the totality of the circumstances, including "the conduct of the police, the nature of the questions asked, and any other relevant circumstances[,]" such that the ultimate question becomes "whether the officer should have known that his or her words or actions were reasonably likely to elicit an incriminating response" from the defendant.  Id. at 119, 34 P.3d at 1018 (citation, internal quotation marks, and brackets omitted).  See State v. Ikaika, 67 Haw. 563, 567, 698 P.2d 281, 284 (1995) (holding that defendant's inculpatory statements were not the product of interrogation where a detective could not have known his words would elicit an incriminating response).[15]

_____

[14]     In Ketchum, officers executing a search warrant for drug contraband detained the defendant in the master bedroom and asked him about his residential address.  97 Hawaiʻi at 111-14, 34 P.3d at 1010-1013.  The officers knew that admissions regarding the defendant's address would assist in prosecuting him for constructive possession of any drug contraband found in the residence.  Id. at 112-15, 34 P.3d at 1011-14.
        Given the circumstances, this court concluded that the defendant's admissions regarding his address were the product of custodial interrogation in violation of his Miranda rights.  Id. at 120-21, 34 P.3d at 1019-20.  This court held:

> Accordingly, we reaffirm the principle that interrogation consists of any express question—or, absent an express question, any words or conduct—that the officer knows or reasonably should know is likely to elicit an incriminating response.  The totality of the circumstances must be considered to determine whether interrogation has occurred, with a focus on the officer's conduct, the nature of the question (including whether the question is a routine booking question), and any other relevant circumstance.

Id. at 121, 34 P.3d at 1020 (citations and internal quotation marks omitted).

[15]     In Ikaika, the defendant invoked his right to counsel when he was detained for questioning as a witness in a murder.  67 Haw. at 564-65, 698

(continued...)

27

A defendant may open the door to the possibility of further questioning by initiating communication with the police and voluntarily waiving his constitutional rights. Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (holding that defendant's inquiry as to what was going to happen next "was not merely a necessary inquiry arising out of the incidents of the custodial relationship[,]" and instead, "evinced a willingness and a desire for a generalized discussion about the investigation").

Substantive questioning may continue only if the defendant voluntarily, knowingly, and intelligently waives his Miranda rights. State v. Hoey, 77 Hawaiʻi 17, 34-36, 881 P.2d 504, 521-23 (1994) (noting that the protection afforded by the Hawaiʻi Constitution is broader than that recognized under the U.S. Constitution). To determine whether a defendant has waived his Miranda rights, the court must examine the entire record and

_____

(...continued)
P.2d at 283. As he was waiting in the booking area, he approached an officer with whom he was acquainted but who was not familiar with the facts of the case or the charge against him. Id. The officer said "What's happening? Must be heavy stuff for two detectives to bring you down here?" Id. The defendant responded that he had been picked up for questioning and then confessed to the murder. Id. The officer informed the defendant of his Miranda rights, but the defendant stated that he did not want an attorney and that he wished to make a statement. Id.

This court held that the relevant inquiry was "whether the police officer should have known that his words or actions were reasonably likely to elicit an incriminating response from the [d]efendant." 67 Haw. at 567, 698 P.2d at 284. We concluded that the defendant's inculpatory statements were not the product of interrogation because the officer was unaware of the circumstances of the defendant's detention and did not initiate questioning until the defendant approached him. Id. at 567-68, 698 P.2d at 284-85.

make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances.  State v. Wallace, 105 Hawaiʻi 131, 143-44, 94 P.3d 1275, 1287-88 (2004); accord State v. Henderson, 80 Hawaiʻi 439, 442, 911 P.2d 74, 77 (1996).  "The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights."  State v. Maluia, 56 Haw. 428, 432, 539 P.2d 1200, 1205 (1975) (citation omitted).  See State v. Edwards, 96 Hawaiʻi at 254, 30 P.3d at 240 (concluding that defendant voluntarily, knowingly, and intelligently waived her Miranda rights, despite the fact that officers failed to use reasonable effort to contact her attorney).

In this case, McKnight unambiguously invoked his right to counsel when he indicated that he did not want to give a statement and wanted an attorney present while being questioned. This invoked the bright-line rule under Edwards v. Arizona, 451 U.S. at 484-85, 101 S.Ct. at 1885, and agents were prohibited from further questioning McKnight until an attorney had been provided or McKnight voluntarily reinitiated communication.

Agent Domingo initially ceased questioning McKnight, but he later returned to the room with the intention of further questioning McKnight to obtain information he hoped to use in a warrant application.  In the meantime, Agent Domingo did not

29

attempt to contact an attorney on McKnight's behalf, ask McKnight whether he wished to contact an attorney, or provide McKnight an opportunity to call an attorney.  When McKnight asked what was going to happen next, Agent Domingo stated that they planned to execute a search warrant on his residence; at the time, agents had not yet obtained a search warrant for McKnight's residence. McKnight then offered to give a statement; however, he again indicated that he wished to speak to his mother.  When Agent Domingo responded that he could not promise anything, McKnight finally agreed to continue with a statement.  It was only after this confluence of events that McKnight agreed to waive his right to an attorney and give a statement.

The totality of the circumstances establishes that McKnight did not reinitiate contact with Agent Domingo, and his subsequent waiver of <u>Miranda</u> rights was not voluntarily give.  In addition to failing to make a reasonable effort to contact an attorney, Agent Domingo's conduct and his comment about executing a search warrant on McKnight's residence were reasonably likely to elicit an incriminating response.[16]  Accordingly, McKnight's waiver

---

[16]    This court has held that a defendant's statement was the product of interrogation where an officer's comment was reasonably likely to elicit an incriminating response—for example, where a detective asked the defendant if he wanted to give "his side of the story," <u>State v. Eli</u>, 126 Hawaiʻi 510, 523, 273 P.3d 1196, 1209 (2012); where an officer questioned a putative rape victim about discrepancies in her polygraph exam and encouraged her to tell the truth, <u>State v. Roman</u>, 70 Haw. 351, 358, 772 P.2d 113, 117 (1989); and where an officer presented the defendant with incriminating evidence in the form of

(continued...)

30

of the right to counsel was not voluntary, and his statement was obtained in violation of his rights under Article I, section 10 of the Hawaiʻi constitution.

For the reasons stated above, we vacate the ICA's judgment vacating the circuit court's February 1, 2007 order granting McKnight's motion to suppress his statement as involuntary.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ Sabrina S. McKenna

/s/ Rom A. Trader

---

[16](...continued)
written witnesses' statements and oral explanations of that evidence, State v. Uganiza, 68 Haw. 28, 30, 702 P.2d 1352, 1355 (1985).

By comparison, we have held that a statement was not the product of interrogation where an officer requested the defendant's consent to search a nylon bag beneath the driver's seat of a car, State v. Rippe, 119 Hawaiʻi 15, 22-24, 193 P.3d 1215, 1222-24 (App. 2008) (holding, however, that a follow-up question concerning defendant's ownership of the car along with statement that the bag was found inside the car did constitute interrogation because this was likely to elicit an incriminating response); or where a sign language interpreter asked a deaf-mute defendant if he wished to make a statement, State v. Naititi, 104 Hawaiʻi 224, 237, 87 P.3d 893, 906 (2004).

PART III:  THE CIRCUIT COURT ERRED IN SUPPRESSING EVIDENCE
OBTAINED PURSUANT TO THE SEARCH WARRANT

By:  Recktenwald, C.J., with whom Nakayama, J., and
Circuit Judge Trader join)

We hold that under the circumstances of this case, the
evidence seized pursuant to a search warrant containing a
scrivener's error should not be suppressed.  Police seized
hundreds of files of suspected child pornography pursuant to a
search warrant supported by probable cause.  The issuing judge
misdated the warrant, but the actual date of issuance was never
in dispute and the warrant was timely served.  Under these
circumstances, no constitutional or other violation occurred, and
suppression of the evidence would not serve any of the purposes
of the exclusionary rule.  Accordingly, the circuit court erred
in suppressing this evidence.

The Hawaiʻi Constitution protects against unreasonable
searches, seizures, and invasions of privacy.  Haw. Const. art.
I, section 7 (1978) (providing that "[t]he right of the people to
be secure in their persons, houses, papers and effects against
unreasonable searches, seizures and invasions of privacy shall
not be violated; and no warrants shall issue but upon probable
cause, supported by oath or affirmation, and particularly
describing the place to be searched and the persons or things to
be seized or the communications sought to be intercepted").  In
addition, a judge must also follow statutory requirements when

issuing a search warrant.  See HRS §§ 803-31 to -34 (1993).  In particular, HRS § 803-34 describes requirements with regard to a warrant's form and content:

> [t]he warrant shall be in writing, signed by the magistrate, with the magistrate's official designation, directed to some sheriff or other officer of justice, and commanding the sheriff or other officer to search for and bring before the magistrate, the property or articles specified in the affidavit, to be disposed of according to justice, and also to bring before the magistrate for examination the person in whose possession the property or articles may be found.

Hawaiʻi Rules of Penal Procedure (HRPP) Rule 41 (2010) further establishes specific requirements that judges must follow when issuing a search warrant.  Specifically, HRPP Rule 41(c) provides, in relevant part, that a warrant "command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified."

Viewed against the foregoing authorities, the judge's scrivener's error did not render the warrant invalid.  As stated above, in compliance with HRPP Rule 41(c), the search warrant stated that it "may be served and the search made on or before July 16, 2006, a date not to exceed ten (10) days from the issuance of this search warrant[.]"  (Emphasis added).  Although Judge Polak indicated on the search warrant that she signed it on June 6, 2006, no one disputes that the search warrant was in fact

signed and issued on July 6, 2006.[17]  Moreover, the affidavit

supporting the warrant refutes any notion that the search warrant

was signed on June 6, 2006.  For example, the affidavit states

that "your affiant commenced the actual physical mechanics of

preparing this affidavit and attached search warrant at 1330

hours, on July 06, 2006[.]"  All of the facts and circumstances

cited to establish probable cause occurred after June 6, 2006.[18]

It is therefore obvious that the actual issuance date could not

have been June 6, 2006.  It is also undisputed that the search

pursuant to the warrant was conducted on July 6, 2006, which was

"on or before July 16, 2006, a date not to exceed ten (10) days

from the issuance of this search warrant[.]"[19]  Finally, the

---

[17]     Agent Domingo also testified at the motion to suppress hearing that he presented the search warrant and affidavits to Judge Polak on July 6, 2006.

[18]     Accordingly, although Judge Polak wrote on the affidavit that it was presented to her on June 6, 2006, the contents of the affidavit demonstrate that Agent Domingo presented the search warrant and affidavit to her on July 6, 2006.

[19]     The dissent states that the ten-day limitation as set forth in HRPP Rule 41(c) "protects against stale warrants[.]"  Dissenting opinion at 16.  We agree.  As discussed in this opinion, however, the record clearly shows that the warrant was not stale; that is, that it was executed within 10 days of its issuance.  To the extent that the dissent cites Commonwealth v. Edmunds, 586 A.2d 887 (Pa. 1991) – which did not involve a clerical error regarding a warrant's issuance date but involved an affidavit that lacked requisite facts – we note in that case, the Supreme Court of Pennsylvania expressly declined to adopt the "good faith" exception to the exclusionary rule, emphasizing, inter alia, that its constitution is "unshakably linked to a right of privacy[.]"  Edmunds, 586 A.2d at 898, 905-06.  We also note that Pennsylvania courts have nonetheless repeatedly rejected the argument that a clerical error regarding the time of a warrant's issuance is fatal.  See, e.g., Commonwealth v. Benson, 10 A.3d 1268, 1271-72, 1274 (Pa. Super. Ct. 2010).  In Benson, a detective served a warrant on a cellular telephone provider on April 28, 2008, when the warrant was issued.  Id. at 1271-72.  The district judge correctly dated the section of the warrant document that indicates the date the warrant application was sworn to, but incorrectly dated
(continued...)

warrant was supported by probable cause.

McKnight does not argue that the search was conducted ten days after the warrant was issued, nor does he argue that the warrant was not supported by probable cause.  Rather, he argues that the evidence obtained pursuant to the warrant must be suppressed solely because the judge misdated the warrant.[20]  We decline to hold that such a technical error renders the warrant in this case invalid.  The above facts, undisputed by the parties and supported by the record, establish the following:  the warrant set forth a date by which it had to be served, that date did not exceed ten days from the warrant's issuance, and the warrant – supported by probable cause – was timely executed.  No constitutional or other violation occurred, and it thus cannot be said that the search was illegal.  See Haw. Const. art. I, section 7 (providing that "no warrants shall issue but upon probable cause, supported by oath or affirmation, and

---

[19](...continued)
the issuing section of the warrant application as April 29, 2008.  Id.  The Pennsylvania Superior Court stated that even if the defendant had a legitimate expectation of privacy in the seized telephone records, the clerical error did not invalidate the warrant, because "Pennsylvania Courts have long held that a technical defect in a warrant, such as the mis-dating at issue here, does not render a warrant invalid in the absence of a showing of prejudice."  Id. at 1274 (citing Commonwealth v. Hamlin, 469 A.2d 137, 140 (Pa. 1983) and Commonwealth v. Begley, 780 A.2d 605, 641 (Pa. 2001)).

[20]     McKnight argues that "[c]ompliance was impossible" because the warrant limited the search to a date not to exceed ten days from the issuance, and the date of the issuance on the face of the warrant read "June 6, 2006." However, the warrant expressly specified that July 16, 2006 was the "date not to exceed ten (10) days from the issuance[.]"  Thus, compliance with the terms of the warrant, which was actually issued on July 6, 2006, was possible; and, under the undisputed facts of the case, compliance did occur.

particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted"); HRS § 803-34; HRPP Rule 41(c) (requiring a warrant to "command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified").

Numerous jurisdictions have rejected the contention that scrivener's errors render a search warrant invalid.[21] See John M. Burkoff, Search Warrant Law Deskbook § 10:2 & § 10.2 n.10 (2013) (listing state and federal cases supporting the proposition that a "clerical error on the face of the warrant misstating or omitting the date or time of issuance is generally held not to be controlling as to the actual date or time of

---

[21] For example, the Ninth Circuit Court of Appeals rejected the argument that a judge's misdating of a search warrant rendered the warrant invalid. See United States v. Hitchcock, 286 F.3d 1064, 1072 (9th Cir. 2002). In Hitchcock, an agent obtained and executed a search warrant on November 16, 1998. Id. at 1071. The agent left a copy of the warrant, dated November 17, 1998, with the defendant's mother. Id. At the outset, the Ninth Circuit rejected the application of the good faith exception, stating: "As we have described it, the good faith execption to the exclusionary rule permits law enforcement officers reasonably to rely on search warrants that are later determined to be invalid[.]" Id. The Ninth Circuit further stated that "[t]he good faith exception has no application here, where there is no dispute about the search warrant's validity but only about whether the agents executed the warrant before it was effective." Id. The Ninth Circuit noted that the defendant did not dispute that although the warrant was dated November 17, 1998, the judge signed and issued the warrant on November 16, 1998. Id. at 1072. The Ninth Circuit also noted that the judge corrected the return copy of the warrant to read "November 16, 1998," and that there was no evidence indicating that the judge intended to postdate the warrant. Id. Ultimately, the Ninth Circuit concluded that "where an agent obtains a search warrant from the court and later that day conducts an otherwise valid search, the search is within the scope of the warrant, notwithstanding the fact that the warrant is post-dated by one day, so long as the evidence in the record indicates that the only reason the search warrant was post-dated was the court's inadvertence." Id.

issuance of the warrant"). For example, in State v. Dalton, 887 P.2d 379 (Or. Ct. App. 1994), a police officer presented a magistrate with an affidavit dated November 9, 1993, but the magistrate issued a warrant dated October 9, 1993. 887 P.2d at 379-80. The warrant was executed the day after its issuance, on November 10, 1993. Id. at 380. The Oregon Court of Appeals held that the inadvertent misdating of the warrant was "simply a scrivener's error" that "did not frustrate the constitutional objective served by the statutory requirement that search warrants be dated and executed within five days of their issuance." Id. In a subsequent case, the Oregon Court of Appeals held that the lack of a year on a warrant's issuance date was a mere scrivener's error that did not require suppression, noting:

> There is no explicit constitutional requirement for a particularized date or, for that matter, for any date at all; rather, the constitution requires only that the warrant be based "upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

State v. Radford, 196 P.3d 23, 26 (Or. Ct. App. 2008); see also Heard v. State, 612 S.W.2d 312 (Ark. 1981) (upholding the validity of a search warrant which was dated 1978 on the top of the document but dated 1976 above the issuing judge's signature

where evidence showed that 1978 was the correct year and the discrepancy was an obvious clerical typographical error).[22]

Jurisdictions that have refused to invalidate search warrants because of a scrivener's error also include states with constitutions that, like ours, recognize the right against unreasonable invasions of privacy as part of their constitutional search and seizure provisions.  For example, the Supreme Court of South Carolina expressly refused to find that the misdating of a search warrant rendered it invalid.  State v. Shupper, 207 S.E.2d 799, 800-01 (S.C. 1974) (cited with approval in State v. Herring, 692 S.E.2d 490, 496 (S.C. 2009)); S.C. Const. art. 1, § 10.[23]  In

---

[22]  The dissent argues that the aforementioned Oregon and Arkansas cases are "inapposite" because the constitutions of those states do not contain the same language regarding the right to privacy that appears in our state constitution; namely, the right to be secure in one's "persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy[.]"  Dissenting opinion at 43-44 (citing Haw. Const. art. I § 7 (emphasis in dissenting opinion)).  Respectfully, this distinction is not dispositive to the issue here, which is whether a scrivener's error in the warrant alone renders the resulting search, seizure and invasion of privacy unreasonable.  In other words, the issue here does not turn on whether the constitution explicitly protects against invasions of privacy; rather, the question is whether an invasion (and search or seizure) is unreasonable.  In any event, as discussed infra, jurisdictions with express privacy protections in their constitutions have also similarly rejected the argument that scrivener's errors alone justify invalidating a warrant.

[23]  Article 1, section 10 of the South Carolina Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

(Emphasis added).

-38-

Shupper, the date typed on the search warrant was January 5,
1972, and the search was made on January 5, 1973.  207 S.E.2d at
800.  The defendant claimed that the warrant violated a statute
that required "execution and return 'within ten days after (the
warrant) is dated[.]'"  Id.  The Supreme Court of South Carolina
rejected that argument, stating that the incorrect date "was a
mere typographical error not affecting [t]he validity of the
search which actually occurred within an hour or two of the
issuance of the warrant."  Id.

    In another jurisdiction with a constitutional privacy
provision similar to Hawaii's, the Court of Appeal of Louisiana
held that a search warrant erroneously dated five months prior to
its actual issuance date was not invalid.  State v. E.J.F., 999
So.2d 224, 231-32 (La. Ct. App. 2008); La. Const. art. 1, § 5.[24]
In that case, the search warrant was originally dated July 21,
2005, and was corrected by the issuing judge, following the
search, to read December 21, 2005.  E.J.F., 999 So.2d at 231.

_____

[24]    Article 1, section 5 of the Louisiana Constitution provides:

> Every person shall be secure in his person, property,
> communications, houses, papers, and effects against
> unreasonable searches, seizures, or invasions of
> privacy.  No warrant shall issue without probable
> cause supported by oath or affirmation, and
> particularly describing the place to be searched, the
> persons or things to be seized, and the lawful purpose
> or reason for the search.  Any person adversely
> affected by a search or seizure conducted in violation
> of this Section shall have standing to raise its
> illegality in the appropriate court.

(Emphasis added).

-39-

Relying on a Louisiana Code of Criminal Procedure provision prohibiting the execution of a search warrant "after the expiration of the tenth day after its issuance[,]" the defendant argued that the evidence seized pursuant to the search warrant should have been suppressed "on the grounds of the warrant being stale, as December 21 is obviously more than ten days past July 21." Id. at 231-32, 231 n.4. The issuing judge, who also presided over the defendant's trial and denied the defendant's motion to suppress, took judicial notice of his handwriting on the search warrant where the corrections to the date were made. Id. at 231-32. On appeal, the E.J.F. court held that the warrant had not expired, noting that testimony clearly indicated that the application for the search warrant was presented to the judge on December 21, 2005, and that the investigation did not begin until December 19, 2005. Id. at 233. The court further stated that "[t]o suggest that the warrant was stale simply ignores the possibility of typographical error, particularly when the judge took judicial notice of his signature next to the correction and the defendant presented no evidence to establish that the warrant was actually prepared on July 21, 2005." Id.

Similarly, the Appellate Court of Illinois upheld the validity of a warrant, which erroneously indicated an issuance time that was about ten hours after the search was actually

conducted.[25]  People v. Deveaux, 561 N.E.2d 1259, 1263-64 (Ill. App. Ct. 1990).  The Deveaux court noted that although there is a presumption that the time indicated on a search warrant controls its validity, "extrinsic evidence is permitted to show and correct an obvious clerical error."  Id. at 1264 (citation omitted).  The Deveaux court also noted statutory language prohibiting the quashing of warrants "'because of technical irregularities'" that do not affect the defendant's substantial rights.  Id.  Based on the officer's "uncontroverted testimony" showing that he was in possession of the warrant at the time of the search, the Deveaux court held that "the time of issuance was a technical irregularity which did not affect defendant's substantial rights."  Id.  The court explained that the defendant's constitutional rights were not violated or disturbed where, inter alia, the officer's complaint for a search warrant was supported by an affidavit describing the place to be searched and the person and things to be seized, the defendant made no

---

[25]      Article 1, section 6 of the Illinois Constitution provides:

> The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means.  No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized.

(Emphasis added).

claim that the warrant lacked probable cause, and the officer executed the search after obtaining the warrant.[26]  Id.

Finally, in Montana, which has a stand-alone constitutional provision recognizing the right to individual privacy,[27] the misdating of a search warrant will not necessarily render the warrant invalid.  See State v. Steffes, 887 P.2d 1196, 1210 (Mont. 1994) (holding that, where the search warrant was misdated June 19, 1991 and was executed on June 18, 1991, the misdating "was merely technical, and did not affect the substantial rights of the defendant").[28]

---

[26]     The dissent argues that the foregoing South Carolina, Louisiana, and Illinois cases are not germane to the instant case because those states recognize a general "good faith" exception to the warrant requirement. Dissenting opinion at 44-45.  Respectfully, however, none of the above cases relied on a "good faith" exception in determining that a mere clerical error alone does not invalidate a warrant.  Moreover, the cases cited by the dissent with regard to the "good faith" exception, see dissenting opinion at 44-45, are factually distinguishable from the instant case and involve the application of a good faith exception analysis only after determining that the warrant was invalid.  See State v. Covert, 628 S.E.2d 482, 486-87 (S.C. Ct. App. 2006), aff'd, 675 S.E.2d 740 (S.C. 2009) (conducting a good faith exception analysis after finding that a warrant was defective because the magistrate's signature was dated two days after the search, and "there was no evidence that the magistrate signed the warrant before the search" (emphasis added)); State v. Maxwell, 38 So.3d 1086, 1091 (La. Ct. App. 2010) (holding that a warrant lacking a description of items to be seized was not facially invalid, and finding, in the alternative, that "even if the warrant were found to be deficient," the seized evidence was admissible under the good faith exception); People v. Turnage, 642 N.E.2d 1235, 1238-39 (Ill. 1994) (applying a good faith exception analysis after determining that a "repetitive" arrest warrant issued after the defendant was arrested on identical charges and released on bond was invalid).

[27]     Article II, section 10 of the Montana Constitution provides:  "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."

[28]     The dissent appears to distinguish Steffes by noting that the Steffes court's upholding of the search warrant was based on a Montana statute that precluded searches and seizures from being rendered illegal by

(continued...)

In sum, the clerical error in the instant case did not render the search warrant invalid.

Moreover, suppressing the evidence would not further any of the purposes of Hawaii's exclusionary rule. This court has recognized three purposes underlying Hawaii's exclusionary rule: (1) judicial integrity, (2) the protection of individual privacy, and (3) deterrence of illegal police misconduct. <u>State v. Torres</u>, 125 Hawaiʻi 382, 394, 262 P.3d 1006, 1018 (2011). As stated above, the only basis to suppress the evidence obtained pursuant to the search warrant in this case would be the issuing judge's clerical error. In light of the facts in the instant case, suppressing the evidence because of a scrivener's error does not serve any of the purposes of the exclusionary rule.

First, suppressing the evidence would not enhance judicial integrity. "The 'judicial integrity' purpose of the exclusionary rule is essentially that the courts should not place their imprimatur on evidence that was illegally obtained by

---

[28](...continued)
"irregularities in the proceedings [that] do not affect the substantial rights of the accused." Dissenting opinion at 45 (quotation marks and citations omitted). Respectfully, this distinction is not dispositive. First, statutes cannot override the protections provided by constitutional provisions. <u>See, e.g.</u>, <u>Becky v. Butte-Silver Bow Sch. Dist. No. 1</u>, 906 P.2d 193, 196 (Mont. 1995) (stating that "the Montana Constitution is the supreme law of the state and preempts contrary statutes or rules"). Moreover, <u>Steffes</u> remains instructive for its holding that the misdating of a warrant alone, where the actual date of issuance has been determined, is a mere technical error that does not violate a defendant's substantial rights. Here, as stated above, the clerical error at issue in the instant case did not prejudice McKnight or otherwise violate his substantial rights.

allowing it to be admitted into evidence in a criminal prosecution." Torres, 125 Hawaiʻi at 394, 262 P.3d at 1018 (citation omitted). Thus, "when evidence is not obtained illegally, no loss of judicial integrity is implicated in a decision to admit the evidence." State v. Bridges, 83 Hawaiʻi 187, 196, 925 P.2d 357, 366 (1996) (citation and quotation marks omitted), overruled on other grounds by Torres, 125 Hawaiʻi 382, 262 P.3d 1006.

Here, there is no harm to judicial integrity in admitting the seized evidence at issue because, as discussed supra, the mere scrivener's error in the issuance date did not result in an unreasonable invasion of McKnight's privacy. As stated above, the search warrant was supported by probable cause, and the search was executed within ten days of the issuance of the warrant. Accordingly, admitting the seized evidence, under these circumstances, in no way compromises judicial integrity.

Second, suppressing the evidence would not serve to protect individual privacy rights. The "primary purpose of both the Fourth Amendment and article I, section 7 [of the Hawaiʻi Constitution] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." State v. Lopez, 78 Hawaiʻi 433, 441, 896 P.2d 889, 897 (1995) (citation and quotation marks omitted). Here, the search of McKnight's residence was not "arbitrary" because government

agents had established a legitimate basis for the search on July 6, 2006, when the search warrant was executed. The warrant was supported by probable cause, and the search was executed on the same day that the search warrant was issued, in compliance with HRPP Rule 41. The existence of the scrivener's error in no way altered these facts, and the search would not have been conducted in a different manner or time had the court written the correct issuance date on the jurat. In other words, the mere scrivener's error caused no greater invasion of McKnight's privacy than would have occurred had the court written the correct issuance date on the jurat. As the ICA stated, "suppression of the search warrant evidence under the circumstances of this case would only serve to benefit those who were validly subject to search, but by pure fortuity happened to draw an issuing judge who made a clerical error in signing the warrant." McKnight, 128 Hawaiʻi at 341-42, 289 P.3d at 977-78. Accordingly, suppressing the evidence at issue would not serve to protect the privacy purpose underlying the exclusionary rule.

Finally, suppression would not advance the principle of deterring illegal police conduct. As stated above, Agent Domingo properly presented a search warrant supported by probable cause to the district court, the search warrant limited the search to no later than July 16, 2006, a date not exceeding 10 days after July 6, 2006, when the warrant was issued, and the resulting

search occurred that day.  The only issue here is a clerical error made by the court.  Simply stated, no illegal police conduct occurred.  Accordingly, suppression of the evidence obtained as a result of the search warrant would not serve to deter law enforcement misconduct.

In sum, the clerical error by the issuing judge did not render the search warrant invalid, and suppressing evidence seized pursuant to the warrant would not further the purposes of the exclusionary rule where, as in this case, the warrant was supported by probable cause, the evidence demonstrates the actual date of issuance, and the warrant was executed within the time frame specified in HRPP Rule 41.[29]  Therefore, the evidence obtained pursuant to the warrant should not have been suppressed.

---

[29]     For all of these reasons, we overrule State v. Endo, 83 Hawaiʻi 87, 924 P.2d 581 (App. 1996).  To the extent that the Endo court held that the privacy protections under the Hawaiʻi Constitution prohibit searches under circumstances such as in the instant case, we respectfully disagree.  The constitution's explicit protections against unreasonable invasions of privacy cannot be said to be violated by a technical scrivener's error where, as here, the search warrant was supported by probable cause and it is undisputed that it was timely executed.

Accordingly, we affirm the ICA's judgment to the extent that it vacates the circuit court's suppression order as to the evidence obtained pursuant to the search warrant, and remand the case for further proceedings consistent with this opinion.

Benjamin E. Lowenthal,
for petitioner

David M. Louie, Attorney
General; Kimberly Tsumoto
Guidry, First Deputy Solicitor
General; Marissa H.I. Luning,
Deputy Solicitor General,
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Rom A. Trader

