IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 4, 2018 Session

## STATE OF TENNESSEE v. JEROME ANTONIO MCELRATH

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Obion County**
**No. CC-15-CR-71; 72    Jeff Parham, Judge**

---

**No. W2015-01794-SC-R11-CD**
**No. W2015-01958-SC-R11-CD**
(consolidated on appeal)

---

SHARON G. LEE, J., concurring in the suppression of evidence; dissenting from the adoption of an exclusionary rule exception for constitutional violations caused by careless police recordkeeping.

A Union City Police Department officer twice arrested and searched Jerome Antonio McElrath because of systemic and long-standing errors in the police department's records. By stopping and searching McElrath without probable cause based on these errors, the police violated McElrath's constitutional right to be free from unreasonable searches and seizures. I disagree with the majority's adoption of an exception to the exclusionary rule to excuse negligent police recordkeeping. That said, I agree with the majority's conclusion that the negligence exception does not apply here because of the police department's systemically flawed recordkeeping process. The majority provides a good roadmap for trial courts to make the fact-intensive determination of whether isolated or systemic negligence caused the police error thus, whether the negligence exception applies.

On April 8, 2015, McElrath was standing outside the Union City Housing Authority's community center—a place he had a right to be. A police officer saw McElrath and believed he was barred from the Housing Authority's property. The officer checked with the police department's dispatcher, who confirmed that McElrath was on the police department's barred list for the Housing Authority. The officer then arrested McElrath for criminal trespass and searched him, finding marijuana. A couple of weeks later, the officer again saw McElrath on the property of the Housing Authority, arrested him a second time for criminal trespass and searched him, finding marijuana.

But the police department's records were wrong and had been wrong for nearly five years. For some unexplained reason, the police department kept two lists: a list of people barred from the Housing Authority's property and another list of people removed from the barred list. In 2007, the police department placed McElrath on the barred list. In 2010, the police department approved McElrath's request for removal from the barred list. The police department added McElrath's name to the removed list but failed to take his name off the barred list. The police department did not merge or reconcile the two lists, resulting in McElrath's name remaining on the barred list for almost five years. To make things worse, the dispatcher only checked the barred list, not the list of people who had been removed from the barred list. McElrath brought the error to the attention of the police department after he had been twice wrongfully arrested because of the faulty recordkeeping.

This haphazard recordkeeping system was bound to result in errors. Although a police department lieutenant testified that the barred list was correct 99% of the time, he offered no basis or explanation for his conclusion. And no basis for this self-serving statistic appears in the record. What we do know is that for almost five years, the police department did not update its barred list to remove McElrath's name, and in 2015, police arrested McElrath two times because of police department errors.

Today, a majority of the Tennessee Supreme Court adopts an exception to the exclusionary rule to excuse negligent police recordkeeping based on *United States v. Herring*, 555 U.S. 135 (2009). In *Herring*, a county sheriff's deputy arrested and searched Bennie Dean Herring after learning that a neighboring county's sheriff's department had an unserved warrant for his arrest. *Id.* at 137. The search uncovered a gun and drugs. *Id.* Yet the neighboring county's records were wrong; there had been a warrant for Herring's arrest in that county, but the warrant had been recalled months earlier. *Id.* at 137–38. The records failed to show the recall of the warrant, resulting in Herring's unlawful arrest and search. *Id.* at 138.

In *Herring*, a majority of the United States Supreme Court, in a 5-4 opinion, ruled that the contraband found in the search was admissible even though the deputy had violated Herring's Fourth Amendment rights. *Id.* at 137. The majority reached this result by adopting an exception to the exclusionary rule, concluding that the contraband was admissible because isolated police negligence attenuated from the arrest had caused the recordkeeping error. *Id.* The majority reasoned that when police conduct is only negligent, rather than caused by systemic error or made with reckless disregard of constitutional requirements, then "any marginal deterrence does not pay its way." *Id.* at 147–48 (internal quotation marks omitted). Exclusion of the evidence would have been justified, according to the majority, if Herring had proven that the police had been reckless in maintaining its records or knowingly made false entries to provide a basis for future false arrests. *Id.* at 146.

2

I agree with the four dissenting justices in *Herring*, who concluded that "[n]egligent recordkeeping errors by law enforcement threaten individual liberty, are susceptible to deterrence by the exclusionary rule, and cannot be remedied effectively through other means." *Id.* at 157 (Ginsburg, J., dissenting). An exception to the exclusionary rule for careless police recordkeeping erodes federal and state constitutional guarantees against illegal searches and seizures. The Fourth Amendment to the United States Constitution declares that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Tennessee Constitution provides another layer of protection by stating that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." Tenn. Const. art. I, § 7.

The exclusionary rule safeguards these constitutional rights by providing a remedy for the violation of the Fourth Amendment and Article I, section 7. This remedy is the suppression of evidence obtained through an illegal search or seizure. *State v. Reynolds*, 504 S.W.3d 283, 309–10 (Tenn. 2016) (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Davis v. United States*, 564 U.S. 229, 236 (2011); *United States v. Calandra*, 414 U.S. 338, 348 (1974); *State v. Huddleston*, 924 S.W.2d 666, 672 (Tenn. 1996)).

Under the exclusionary rule, police gain no benefit from an illegal search and, thus, have a strong incentive to comply with the constitutional prohibitions against unreasonable searches and seizures. *See Reynolds*, 504 S.W.3d at 310 (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)) (stating that the purpose of the exclusionary rule is "to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it"). The conclusion in *Herring* that there would be only marginal deterrence from excluding evidence based on police negligence goes against the long-standing tort principle that individuals and entities have an incentive to act with due care when there is liability for negligence. The distinction between police conduct that is negligent as opposed to intentional or reckless, as noted by *Herring*, is of little comfort to a citizen who the police wrongfully arrest, handcuff, search, and haul off to jail. Whatever the cause of the error, the result is the same—a violation of a basic constitutional right. We should not reduce a citizen's right to be free from unreasonable searches and seizures to a cost-benefit analysis, as it was in *Herring*. *See State v. McKnight*, 319 P.3d 298, 325 (Haw. 2013) (Acoba, J., dissenting). The exception for police negligence is poised to swallow the exclusionary rule. *Davis*, 564 U.S. at 258 (Breyer, J., dissenting); *accord McKnight*, 319 P.3d at 325 (observing that after *Herring*, safeguards of constitutional rights provided by the exclusionary rule have been largely eviscerated).

Many legal commentators have appropriately criticized the *Herring* exception for negligent police recordkeeping. *See* 1 Steve C. Posner, *Modern Privacy & Surveillance Law* § 2.08 (Matthew Bender & Co. 2018) (asserting that the *Herring* exception is

3

tantamount to a policy decision that "convicting criminals is more important than preventing citizen victimization due to police negligence in record keeping"); Thomas K. Clancy, *The Irrelevancy of the Fourth Amendment in the Roberts Court*, 85 CHI.-KENT L. REV. 191, 207 (2010) (predicting that a broad reading of the "mere negligence" standard under *Herring* might "make many—if not most—Fourth Amendment violations inappropriate candidates for suppression"); George M. Dery, III, *Good Enough for Government Work: The Court's Dangerous Decision, in Herring v. United States, to Limit the Exclusionary Rule to Only the Most Culpable Police Behavior*, 20 GEO. MASON U. C.R. L.J. 1, 27 (2009) (contending that *Herring* signals to the police that negligence by individual agents need not be avoided); Alex R. Hess, *Herring v. United States: Are Errors in Government Databases Preventing Defendants from Receiving Fair Trials?*, 11 J. HIGH TECH. L. 129, 131 (2010) (pointing out the unfairness in admitting illegally seized evidence while giving the government a pass for keeping incorrect records); Matthew Allan Josephson, *To Exclude or Not Exclude: The Future of the Exclusionary Rule After Herring v. United States*, 43 CREIGHTON L. REV. 175, 196 (2009) (noting that if *Herring* allows the admission of illegally seized evidence, as long as the police did not act culpably, then the warrant requirement would eventually not be much of a requirement at all); Candace C. Kilpinen, Comment, *Herring v. United States: A Threat to Fourth Amendment Rights?*, 44 VAL. U. L. REV. 747, 756 (2010) (warning that *Herring* may result not only in the loss of the exclusionary rule but also in the demise of the Fourth Amendment itself); Wayne R. Lafave, *The Smell of Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule*, 99 J. CRIM. L. & CRIMINOLOGY 757, 782 (2009) (concluding that police are better positioned to remedy their own errors and might do so "if the exclusionary rule were there to remove the incentive to do otherwise"); Jennifer E. Laurin, *Trawling for Herring: Lessons in Doctrinal Borrowing and Convergence*, 111 COLUM. L. REV. 670, 744 (2011) (concluding that *Herring* "may well represent a sweeping rollback of the exclusionary rule that will effectively preclude any remedy for entire categories of Fourth Amendment violations—in particular, those resulting from negligent police conduct"); Claire Angelique Nolasco et al., *What Herring Hath Wrought: An Analysis of Post-Herring Cases in the Federal Courts*, 38 AM. J. CR. L. 221, 231 (2011) (quoting *United States v. Jones*, 620 F. Supp. 2d 163, 177 (D. Mass. 2009)) (noting the view that "*Herring* foreshadows the elimination of the exclusionary rule altogether"); *see also* David L. Hudson, Opinion, *Tennessee Supreme Court Must Resist Chipping Away at Fourth Amendment Rights*, THE TENNESSEAN, March 21, 2018, https://www.tennessean.com/ story/opinion/2018/03/21/tennessee-supreme-court-fourth-amendment-rights/374946002/ ("The exclusionary rule ensures that the government does not violate the law in fulfilling its mission.").

Against this backdrop, a majority of the Tennessee Supreme Court in *State v. Reynolds*, 504 S.W.3d 283, 313 (Tenn. 2016), adopted a narrow exception to the exclusionary rule for constitutional violations. The exception was based on *Davis v.*

*United States*, 564 U.S 229 (2011), and applied to evidence obtained in reliance on binding judicial precedent later overturned. *Reynolds*, 504 S.W.3d at 312. I dissented in *Reynolds*, because "[t]he adoption of this exception for a constitutional violation erodes our citizens' rights to be free from unreasonable searches and seizures as guaranteed by the United States and Tennessee Constitutions." *Id.* at 315 (Lee, J., dissenting). That said, I later joined in adopting a good faith exception for a statutory or procedural rule violation. *See State v. Davidson*, 509 S.W.3d 156 (Tenn. 2016); *State v. Daniel*, 552 S.W.3d 832 (Tenn. 2018); *State v. Lowe*, 552 S.W.3d 842 (Tenn. 2018). A constitutional violation differs from a statutory or rule violation. Our federal and state constitutions are the foundation of our democracy and have withstood the test of time. Statutes and rules are important but can be amended or repealed from one legislative session to the next. To this point, Tennessee Rule of Criminal Procedure 41, the violation of which was at issue in *Davidson*, *Daniel*, and *Lowe*, was amended after these opinions were issued to give courts discretion in suppression decisions. *See Daniel*, 552 S.W.3d at 835 n.5 (explaining that the amended version of Rule 41 permits a trial court to exercise discretion in ruling on a motion to suppress if the conduct at issue violates Rule 41, but not the Constitution).

We have interpreted Article I, section 7 of the Tennessee Constitution to be "identical in intent and purpose with the Fourth Amendment," *Reynolds*, 504 S.W.3d at 303 (internal quotation marks omitted), but we have "not hesitated to extend greater privacy protections to the citizens of this State when appropriate" under that section. *State v. Randolph*, 74 S.W.3d 330, 335 (Tenn. 2002); *accord Miller v. State*, 584 S.W.2d 758, 760 (Tenn. 1979). Although we look to the United States Supreme Court to guide our interpretation of state constitutional rights, we need not move in "lockstep" with its decisions. *See State v. Handy*, 18 A.3d 179, 186 (N.J. 2011).

In sum, declining to hold the police accountable when their negligence results in a constitutional violation erodes public trust in the judicial system, makes courts participants in "official lawlessness," and signals that the government may indeed profit sometimes "from its lawless behavior." *Herring*, 555 U.S. at 152 (Ginsburg, J., dissenting) (citations omitted); *see also Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting) ("To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution."), *overruled in part by Berger v. State of New York*, 388 U.S. 41 (1967) and *Katz v. United States*, 389 U.S. 347 (1967); *State v. Hess*, 785 N.W.2d 568, 584–85 (Wis. 2010) (rejecting the proposition that under *Herring* and other recent Supreme Court decisions, "judicial integrity" is no longer a part of the exclusionary rule analysis). Courts abdicate their responsibility to protect citizens' constitutional rights by imposing no consequence on police carelessness that results in a violation of these sacred rights. We should reject the *Herring* exception and preserve the efficacy of the exclusionary rule to redress

5

constitutional violations and not justify negligent police conduct at the expense of constitutional rights.

Although I dissent from the adoption of the *Herring* exception for negligence, I concur in the majority's decision that McElrath's arrests were the result of long-standing mistakes in the police department's records caused by an inherently flawed recordkeeping system.

_____

SHARON G. LEE, JUSTICE